Argued and submitted September 18, affirmed November 20, 1996

## FEDERATION OF PAROLE AND PROBATION OFFICERS
and James D. Kiely,
*Appellants,*

*v.*

## STATE OF OREGON,
by and through the
Oregon Department of Corrections,
*Respondent.*

(16-9509194; CA A92234)

928 P2d 335

Riggs, P. J., filed concurring opinion.

Gene Mechanic argued the cause for appellants. With him on the briefs was Goldberg, Mechanic & Stuart.

Michael D. Reynolds, Assistant Solicitor General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

Riggs, P. J., concurring.

## LEESON, J.

Plaintiffs Federation of Parole and Probation Officers (FOPPO) and James Kiely (Kiely) appeal from a summary judgment for respondent State of Oregon. ORS 19.010. The issue is whether ORS 423.549, which transfers to the counties the duties of state parole and probation officers, but does not transfer the officers themselves, violates various provisions of the Oregon Constitution. The trial court concluded that it did not and granted the state's motion for summary judgment. We affirm.

FOPPO is a labor organization that represents all state and most county parole and probation officers. Kiely, a state parole and probation officer, is the president of FOPPO. State and county parole and probation officers are public employees. ORS 236.610, which was enacted in 1963, provides that

"(1)  No public employee shall be deprived of employment solely because the duties of employment have been assumed or acquired by another public employer, whether or not an agreement, annexation or consolidation with the present employer is involved. Notwithstanding any statute, charter, ordinance or resolution, but subject to ORS 236.605 to 236.640, the public employee shall be transferred to the employment of the public employer that assumed or acquired the duties of the public employee, without further civil service examination."

Notwithstanding ORS 236.610, the 1995 legislature enacted ORS 423.549, popularly known as Senate Bill 1145, section 16. That statute takes effect January 1, 1997 and provides, in part:

"(1)  Notwithstanding ORS 236.605 to 236.640, all state positions in the state community corrections[1] branch of the Department of Corrections, the funding for which is transferred to counties, are abolished on January 1, 1997. Counties have sole discretion in the development of methods and means of county community corrections operation under ORS 423.500 to 423.560 including establishment of

---

[1] State and county "parole and probation" officers are also known as state and county "community corrections" officers.

wages, benefits and working conditions and selection of any employees to operate supervision programs or other services and sanctions * * *."

The parties agree that ORS 423.549 transfers the *duties* of all state parole and probation officers to the counties, but it does not transfer the *officers*. The effect of the statute is to eliminate all state parole and probation jobs as of January 1, 1997.

Plaintiffs brought this action seeking both a declaration that ORS 423.549 violates their rights under the state constitution and an injunction prohibiting the state from implementing the statute unless plaintiffs are transferred to county employment. Their complaint alleges four causes of action, which we summarize as follows:

1.   ORS 236.610 is a unilateral contract offer by the state that was accepted through part performance by plaintiffs and that created a statutory contract between the state and plaintiffs that guarantees them job transfers if another public employer assumes their duties. ORS 423.549 impairs the state's obligations under that contract, in violation of Article I, section 21, of the Oregon Constitution;

2.   ORS 423.549 grants to county parole and probation officers privileges (*i.e.*, the retention of transfer rights) not equally given to state parole and probation officers, in violation of Article I, section 20, of the Oregon Constitution;

3.   ORS 423.549 violates plaintiffs' due process rights, in violation of Article I, section 10, of the Oregon Constitution;

4.   ORS 423.549 amounts to a taking of private property (*i.e.*, the transfer rights provided by ORS 236.610) for public use without just compensation, in violation of Article I, section 18, of the Oregon Constitution.

The state argued to the trial court that ORS 236.610 is not a statutory contract. Consequently, according to the state, there is no contract for ORS 423.549 to impair, plaintiffs have no property interest to be taken, and plaintiffs will suffer no legally cognizable injury when ORS 423.549 takes effect. Further, the state argued, state parole and probation officers are not a true class under Article I, section 20, and, even if they are, the state has a rational basis for treating state parole and probation officers differently from county parole and probation officers. Both parties moved for summary

judgment. The trial court granted the state's motion and denied plaintiffs' motion.

■    Plaintiffs' four assignments of error on appeal reiterate the four claims they made below. Because there are no genuine issues of material fact, we review the trial court's grant of summary judgment only to determine if the state was entitled to judgment as a matter of law. *Jones v. General Motors Corp.*, 139 Or App 244, 911 P2d 1243, *rev allowed* 323 Or 483 (1996). Whether ORS 423.549 violates the state constitution is a question of law. *See Oregon State Police Officers' Assoc. v. State of Oregon*, 323 Or 356, 361, 918 P2d 765 (1996) (stating standard of review of circuit court's declaration that ballot measure violates federal constitution).

■    Plaintiffs first assign error to the trial court's holding that ORS 423.549 does not violate Article I, section 21, of the Oregon Constitution (the Contracts Clause). That clause provides that "[n]o * * * law impairing the obligation of contracts shall ever be passed[.]" The Supreme Court has held that the Contracts Clause applies to contracts made by the state as well as to contracts between private parties. *Eckles v. State of Oregon*, 306 Or 380, 390, 760 P2d 846 (1988), *appeal dismissed* 490 US 1032 (1989). As a result, "if the appropriate contractual conditions are met, one legislature may bind a succeeding legislature to a particular course of action." *Hughes v. State of Oregon*, 314 Or 1, 13, 838 P2d 1018 (1992). To establish a violation of the Contracts Clause, plaintiffs must show both that a contract between themselves and the state exists and that some law impairs the obligations arising from that contract. *Id.* at 13-14.

■    The first, and in this case dispositive, question is whether ORS 236.610 creates a contract between plaintiffs and the state. The Supreme Court has held that a contract will not be inferred from any legislation unless that legislation "*unambiguously* expresses an intention to create a contract." *Id.* at 17 (emphasis supplied). Where doubt concerning the formation of such an agreement exists, that rule eliminates the state's alleged contractual obligations. *Eckles*, 306 Or at 397. Where the legislation "contain[s] nothing indicative of a legislative commitment not to repeal or amend the statute in the future," a statutory contract probably cannot

be found. *Id.* at 391. Because a statutory contract unambiguously must express that legislative commitment, resort to the legislative history to root out some latent legislative promise is inappropriate. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993) (courts may examine legislative history to discern legislative intent only when that intent is not clear from text and context of statute). Legislative history can resolve ambiguity but cannot remove it.[2] A statute is unambiguous where the text provides support for only one plausible interpretation. *See Heinzel v. Backstrom*, 310 Or 89, 96, 794 P2d 775 (1990) (contract is ambiguous if it supports conflicting interpretations); *see also Hughes*, 314 Or at 14 (general principles of contract law normally govern inquiry into whether statute creates contractual obligations for state).

Plaintiffs read ORS 236.610 as a guarantee to public employees that, so long as they remain public employees, they will be transferred to any public employer that subsequently assumes their job responsibilities, and that this guarantee may not be withdrawn by any past, present, or future statute, charter, ordinance, or resolution. The state concedes that plaintiffs' reading of ORS 236.610 is plausible. We agree. By its terms, ORS 236.610 supersedes *"any* statute, charter, ordinance or resolution." (Emphasis supplied.) "Any statute" could refer to past, present or *future* statutes, including ORS 423.549. Had the legislature intended ORS 236.610 to supersede only statutes in existence in 1963, it could have done so simply by inserting the word "existing" into the text of the statute. Furthermore, ORS 236.610(1) contains emphatic, mandatory language: *"No public employee shall be deprived of employment* solely because the duties of employment have been assumed or acquired by another public employer[;] * * * [n]otwithstanding any statute * * * the public *employee shall be transferred*[.]" (Emphasis supplied.)

■ Despite the state's concession that plaintiffs' interpretation of ORS 236.610 is plausible, the state argues that the statute supports another interpretation. It contends that ORS 236.610 means that, so long as the statute remains fully

---

[2] The concurrence therefore errs in consulting legislative history in this case.

in force, public employees will be transferred to any public employer that subsequently assumes their job responsibilities, notwithstanding any *prior* statute, charter, ordinance, or resolution to the contrary. The state is correct that no term of the statute explicitly binds future legislatures to a particular course of action. Although the legislature could have created contractual obligations for itself with explicit statutory language specifically prohibiting future amendment or repeal, nothing in the statute so insulates it. The presence of the phrase "shall be" in the statute does not prohibit amendment or repeal. Nor does that phrase alone suffice to create contractual obligations on behalf of the state.[3] A statute must be considered "in its entirety" and must "clearly and plainly" indicate the legislature's intention to surrender its sovereign power to alter and change policy in the interest of public welfare. *Campbell v. Aldrich*, 159 Or 208, 212, 217, 79 P2d 257, *appeal dismissed* 305 US 559 (1938). Consequently, the state's interpretation also is plausible.

Because both plaintiffs' and the state's interpretations of ORS 236.610 are plausible,[4] the statute does not unambiguously express an intention to create a contract.[5] Thus, ORS 236.610 does not create a contract. Consequently, plaintiffs have no statutory contract rights subject to impairment by ORS 423.549.

---

[3] *Hughes* is not to the contrary. There, the court held that the entire PERS statutory scheme constitutes a contract, but it expressly refused to consider whether *former* ORS 237.201, which used the phrase "shall be," by itself created a contract. *Hughes*, 314 Or at 21 n 27.

[4] We agree with the concurrence that other interpretations of ORS 236.610 are plausible. We limit our discussion to the two interpretations advanced by the parties.

[5] In a memorandum of supplemental authority, plaintiffs cite *Oregon State Police Officers' Assoc. v. State of Oregon*, 323 Or 356, 371, 918 P2d 765 (1996), for the proposition that "the state may undertake binding contractual obligations with its employees, including benefits that may accrue in the future for work not yet performed." (Emphasis omitted.) That case does not support plaintiffs' contention that ORS 236.610 creates a statutory contract. The question in this case is not whether the state *may* undertake contractual obligations, but rather whether the state *did* undertake contractual obligations when it enacted ORS 236.610. Because the court in *Oregon State Police Officers' Assoc.* started from the well-established premise that PERS is a contract, it never addressed the issue of statutory contract formation. Consequently, that case is inapposite.

■   Plaintiffs next assign error to the trial court's holding that ORS 423.549 does not violate Article I, section 20, of the Oregon Constitution, which prohibits laws "granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." The threshold question in that analysis is whether plaintiffs constitute a "class of citizens." The Supreme Court has interpreted that phrase to mean citizens who possess "antecedent personal or social characteristics or societal status" by which they could be "singled out from the general population." *Hale v. Port of Portland*, 308 Or 508, 525, 783 P2d 506 (1989); *see also Hewitt v. SAIF*, 294 Or 33, 45, 653 P2d 970 (1982) (identifying race, alienage, gender, and nationality as immutable characteristics). State parole and probation officers exist as a "class" solely because of the statutory scheme creating community corrections officers and that class remains open for anyone to join on equal terms. Such open classes "are not even considered to be classes for the purposes of Article I, section 20." *Sealey v. Hicks*, 309 Or 387, 397, 788 P2d 435, *cert den* 498 US 819 (1990); *Wilson v. Dept. of Rev.*, 302 Or 128, 132-33, 727 P2d 614 (1986); *State v. Clark*, 291 Or 231, 240-41, 630 P2d 810, *cert den* 454 US 1084 (1981); *Jarvill v. City of Eugene*, 289 Or 157, 184-85, 613 P2d 1, *cert den* 449 US 1013 (1980).

■   Plaintiffs' third and fourth assignments of error merit only passing mention in the light of our conclusion that ORS 236.610 is not a statutory contract. Because there is no contract, ORS 236.610 created no contractual obligations on the state and no property rights for plaintiffs. Consequently, plaintiffs have no property that could be "taken" in violation of Article I, section 18, of the Oregon Constitution.[6] For the same reason, ORS 423.549 does not violate Article I, section 10, of the Oregon Constitution.[7] Because plaintiffs have no property rights under ORS 236.610, repeal of the transfer provision as to state parole and probation officers does not

---

[6] Article I, section 18, of the Oregon Constitution provides, in relevant part:

"Private property shall not be taken for public use * * * without just compensation * * *."

[7] Article I, section 10, of the Oregon Constitution provides, in relevant part:

"[E]very man shall have remedy by due course of law for injury done him in his person, property, or reputation."

constitute a legally cognizable injury to plaintiffs for which the law must provide a remedy.

The trial court did not err in granting summary judgment to the state on plaintiffs' constitutional claims under Article I, sections 21, 20, 18 and 10, of the Oregon Constitution.

Affirmed.

**RIGGS, P. J.,** concurring.

Although I concur in the majority's holding that there is no Contracts Clause violation in this case, I write separately to express my differing view regarding the manner in which claims such as plaintiffs' should be analyzed. In particular, I believe that the presence of an ambiguity in ORS 236.610(1) requires that we resort to the legislative history that underlies that statute, to determine whether the legislature intended to create a contract with public employees. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993). However, having examined all of the relevant legislative history and having found no evidence that the legislature *did* intend to create a contract when it enacted ORS 236.610(1), I concur in the result reached by the majority.

My analysis of ORS 236.610(1) begins with the text of the statute. Its terms are clear and emphatic: "No public employee shall be deprived of employment solely because the duties of employment have been assumed or acquired by another public employer[.]" However, the second sentence of the statute, which begins with the phrase "Notwithstanding any statute, charter, ordinance or resolution," could refer only to its "no further civil service exam" provision *or* it could refer to both that provision *and* the promise of transfers, contained in the first sentence. It is unclear which meaning the legislature intended.[1]

---

[1] I find no relevance in the fact that the statute does not *also* say that it applies "Notwithstanding any **past, present or future** statute," because no previous case has viewed that sort of language as necessary for the establishment of a Contracts Clause violation and because the plain language of the statute commands that public employees shall not lose their jobs in the very circumstances that are presented by this case: The state has chosen to no longer perform parole and probation officer work; those duties—and the funds necessary to carry them out—are being transferred to the counties.

An examination of the *context* of ORS 236.610(1) requires a review of the two cases that have directly interpreted it. The first, *Dist. Ct. v. Multnomah Co.*, 21 Or App 161, 534 P2d 207 (1975), presented the question of whether a discharged public employee who had not taken a civil service exam before his hiring could appeal his discharge from employment and be reinstated by the Multnomah County Civil Service Commission. We held that that body was without jurisdiction to order the employee's reinstatement, because although his name had been accidentally listed among the names of civil servants who were transferred when the Portland Municipal Court was merged with the Multnomah County District Court, he had not in fact acquired civil service status during the time that he was employed by the municipal court. We wrote:

> "This process of submitting the names of civil service employees from one governmental unit to the civil service commission of another governmental unit for automatic induction into that governmental unit's civil service system is known as 'blanketing in' and is apparently done under authority of ORS 236.610(1): [statute quoted in full]. The import of this statute is clear. A *civil service employee* covered under the statute and transferred to another governmental unit shall be so transferred 'without *further* civil service examination.' An employee who never had civil service status is not within the protection of ORS 236.610." *Id.* at 164 (emphasis in original).

Thus, the statute was interpreted in *Dist. Ct. v. Multnomah Co.* as little more than a provision that obviated further civil service exams for transferees. Although the facts of the case presented no basis for analyzing the transfer provision itself, the opinion points to yet another plausible interpretation of the statute, *viz.*: Its applicability could be limited to those situations in which a public employer has improperly required one of its transferred-in employees to retake a civil service exam. Indeed, if the first sentence of the statute ("No public employee shall be deprived of employment solely because the duties of employment have been assumed or acquired by another public employer") is read as a mere preface to the second sentence ("the public employee shall be transferred * * * without further civil service examination"), or if the

ostensibly broad promise of the first sentence is viewed as being strictly qualified by the second, one could conclude that ORS 236.610(1) does no more than assure transferred civil servants that they will not lose their jobs if they fail the civil service exam upon transfer, because their ⁿnew public employer cannot require them to retake that exam.

In the only other appellate opinion that has interpreted ORS 236.610, *Davis v. Wasco IED*, 286 Or 261, 263, 593 P2d 1152 (1979), the Supreme Court described the statute as one "which grant[s] a certain measure of job security to a 'public employe' when the duties he or she performs are assumed by another governmental agency." Although that opinion focused almost entirely on the definition of "public employe," contained in subsection (2) of the statute,[2] and engaged in no direct discussion of subsection (1), *Davis* is nonetheless noteworthy because of its examination of legislative history:

> "ORS 236.610 to 236.650 were enacted in 1963 at the urging of the AFL-CIO (*See* Minutes, House Committee on Local Government, March 26, 1963, Discussion of HB 1474), and were *designed to guarantee certain rights to employes* of a governmental agency when their functions or duties were transferred to another governmental agency on the merger[3] of those two agencies." (Emphasis supplied.)

The court agreed with the defendant's following characterization of the legislature's "focus" in enacting those statutes:

> " '[T]he legislators were addressing problems caused by the various civil service laws. They were concerned with (1) Civil Service Law restrictions which would preclude the acquiring government from installing acquired employees anywhere but "the bottom of the pile" and, conversely,

---

[2] The court found an ambiguity in the statute's definition of "public employe" as applied to the plaintiff, a school teacher, because elsewhere in the statutory scheme there are references to merit system procedures and civil service exams, neither of which are applicable to school teachers. 286 Or at 267-68. The court ultimately held that the transfer provision of ORS 236.610, with its reference to "public employe[s]," does not apply to school teachers.

[3] Although the court referred only to mergers, because that was the underlying event in *Davis*, the statute makes plain that it applies to all transfers between public employers, "whether or not an agreement, annexation or consolidation with the present employer is involved." ORS 236.610(1).

(2) civil service restrictions which would inhibit demoting or laying off acquired employees where no comparable position is available after the acquisition.' " 286 Or at 269.

There is a considerable amount of legislative history that was *not* discussed in the *Davis* opinion, no doubt because the court's interest in the history of the statute was limited to the fact that public school teachers were neither mentioned by, nor represented before, the relevant legislative committees. *Id.*

In sum, neither the text nor context of ORS 236.610 provides assistance in determining whether the statute was intended to create a contract. Accordingly, we must turn to the legislative history. *PGE v. Bureau of Labor and Industries*; *see also Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 405, 918 P2d 765 (1996) (Gillette, J., concurring and dissenting in part) (critizing majority for failing to acknowledge *PGE*'s methodology in resolving a Contracts Clause claim).

It is at this juncture that I part company with the majority, whose holding I would summarize as follows: Given that a Contracts Clause violation will be found only if ORS 423.549 (Senate Bill 1145) impaired the state's obligations under the alleged statutory contract, and given that that contract must have been created by a statute that *unambiguously* expresses the legislature's intention to create a contract, we need only determine whether the plain language of the statute clearly expresses such an intent. Because it does not, plaintiffs lose.

I agree that, to decide whether Senate Bill 1145 violates the Contracts Clause of the Oregon Constitution, we are guided by the rule that no statutory contract will be "inferred from legislation that does not unambiguously express an intention to create a contract." *Hughes v. State of Oregon*, 314 Or 1, 17, 838 P2d 1018 (1992).[4] The portion of that rule that

---

[4] However, I strongly disagree with the majority's conclusion that, because ORS 236.610 contains no "explicit statutory language specifically prohibiting future amendment or repeal," it does not create a contract. The Supreme Court has never imposed such a requirement. Rather, relying on *Eckles v. State*, 306 Or 380, 391, 760 P2d 846 (1988), *appeal dismissed* 490 US 1032 (1989), the court has repeatedly and recently stated the familiar test for statutory contracts: " 'a state contract will not be inferred from legislation that does not unambiguously express

refers to unambiguous expression understandably gave rise to the majority's analysis, which essentially states that ambiguity exists if there is more than one plausible interpretation of the statute, holds that two such interpretations exist here, and concludes that the statute therefore is not an unambiguous expression of the legislature's intent to create a contract. One can hardly quarrel with such an analysis.

However, I am troubled by the fact that no previous Contracts Clause case has been decided in that manner. The court has never been faced with a statute that *on its face* expressed the legislature's intention to create contractual obligations for the state.[5] It has always examined the legislative history in order to determine the existence of such intention. Therefore, I, too, would look to the history underlying ORS 236.610(1).

As originally drafted in 1963, House Bill 1474 (subsequently enacted as ORS 236.610) provided:

"Relating to transfer of employes between governmental units entering into intergovernmental cooperation contracts.

"Section 1. Whenever local governments or public corporations have entered into agreement pursuant to ORS 190.010 or 190.110, the governing bodies *may* provide, notwithstanding any limitation of charter or statute, that the employes of one contracting party *may* be transferred to positions under the other contracting party without further civil service examination[.]" (Emphasis supplied.) Exhibits, HB 1474, House Committee on Local Government, 1963.

---

an intention to create a contract[.]' " *Stovall v. State of Oregon,* 324 Or 92, 111, 922 P2d 646 (1996) (quoting *Hughes*).

[5] In *Hughes,* the statute referred to the "right" of a person to money accrued under the PERS program and stated that such money would be exempt from taxes "heretofore or hereafter" imposed. The court did not need to determine the existence of a contract, because previous cases had established that PERS is a contract between the state and its employees. However, despite that fact, the court examined the relevant legislative history and found that it "reveals an underlying legislative intent to create contract rights in PERS employees." 314 Or at 18. In other words, it would appear that an "underlying" intent can suffice when no "express" intent is manifested in the language of the statute. In *Eckles,* the statute provided that the state disclaimed any right to reclaim funds paid into the Industrial Accident Fund and that those funds would be used exclusively for purposes declared by the workers' compensation statutes. Again, the court found a statutory contract.

Two witnesses testified before the House committee to which the bill had been referred. The first, then-Mayor of Portland Terry Schrunk, discussed the importance of cities and the counties in which they are located taking steps to consolidate or at least not duplicate services such as crime labs and health services. He testified that if Portland annexed a fire district or a water district, HB 1474 would ensure that "these people's jobs are taken care of. Should there be a combination of services, whether it should be in police service, planning or what[ever] it might be, if these people are under Civil Service, *their jobs will be protected* as they are in the county government or city government." (Emphasis supplied.) Minutes, House Committee on Local Government, March 26, 1963.

Two bills—HB 1474 and HB 1595—were then consolidated in a manner that, according to the chair of the House committee, "amounts to a compromise bill." Minutes, House Committee on Local Government, March 26, 1963, at 5 (statements of Chairman Bateson). The second witness to come before the committee, Dick House of the AFL-CIO, then testified as follows:

> "I might say that [HB 1474 and 1595] are our bills. As you know, there is a great deal going on in the way of annexation, consolidation, etc., and we as representatives of employes are concerned with the employes themselves as to what treatment they will receive. *The two bills before you deal with (1) Contracts* and (2) Annexation and Consolidation."

*Id.* at 6.

Thereafter, HB 1595 was tabled and the committee proceeded with HB 1474—the bill described by the AFL-CIO representative as "deal[ing] with" contracts. The committee recommended that HB 1474 pass, but with substantial amendments: It placed a period after the word "units," in the first paragraph, and struck the remainder of that sentence. It then struck all of the second paragraph except the words "Section 1," and replaced the deleted text with the following:

> "No public employe shall be deprived of his employment solely because the duties of his employment have been assumed or acquired by another public employer, whether or not an agreement, annexation or consolidation with his

present employer is involved. Notwithstanding any statute, charter, ordinance or resolution, but subject to sections 2 to 5 of this Act, the public employe shall be transferred to the public employer who assumed or acquired his duties, without further civil service examination." Minutes, House Committee on Local Government, April 2, 1963.

Except for later changes that made the language gender-neutral, that is essentially the form in which we find ORS 236.610(1) today.

As the legislative history shows, House Bill 1474 was transformed from one that explicitly focused on giving public employers *discretion* to transfer employees between themselves without further civil service examination, to one that *directed* employers to do so. But the legislative record available seems to show that the committee members who approved those amendments appear to have paid little attention to or placed little emphasis on the meaning of the "No public employee shall be deprived of employment" language, focusing instead on subsections 2 through 5 of the bill, which delineate the terms of transferred employees' salaries, health plans, vacation and sick leave.

"CHAIRMAN: The problem is that in one place you have Civil Service. The heads of the city of Portland can't negotiate away these Civil Service rights, so they can't give the employes of this unit they are merging with, any rights. They don't have a right to give away [*sic*] to them. This law would say that they do have the right to mesh these two groups; otherwise the outfit being taken over would go to the bottom of the pile.

"WHELAN: This would take care of the provision also, if you didn't have a position for the employe. You could assign him in a lesser capacity, and then he would be like on a 'laid off' list and would have priority on a future vacancy, which they certainly don't now.

"CHUINARD: *Is it going to force the group to absorb all of these [employees]?*

"CHAIRMAN: No, this is not enforcement.

"WHELAN: They have to have qualifications, first of all. And then such position as is available; that's why this other amendment was put in there.

"CHAIRMAN: *They don't have to hire them. We had another bill in that would have required them to hire them, but that's not this one.*

"BONESTEELE: Just for clarification, my position would be if the City of Salem was going to annex Four Corners and they had Ted Miller out there, the Fire Chief, he would certainly be integrated into the Civil Service or whatever, wouldn't he?

"WHELAN: Not as a Fire Chief.

"BONESTEELE: Not as a Fire Chief, but something comparable, and he might get more money than being Fire Chief.

"CHAIRMAN: He would be integrated as a Captain. The problem is where you are trying to merge two units and cut down your staff; County and City Health Department, for example.

"\* \* \* \* \*

"CHAIRMAN: If we don't do this, you can never save money by one of these [merger] agreements, because you have to keep all the same people. *This would allow you to cut down your staff.*" Minutes, House Committee on Local Government, April 2, 1963. (Emphasis supplied.)

To the extent that any uncertainty as to the focus of the bill remains, it is cleared up by the testimony of AFL-CIO spokesperson Dick House before the Senate Committee on Local Government:

"*The bill [HB 1474] provides that whenever one governmental unit assumes the functions of another governmental unit, that they will also be charged with the responsibilities of the employes of the unit from whom they received the functions from. However, you will find that the bill does give the transferee employer a great latitude in handling the employes of this new unit.* It says that they will place them on their roster but it is subject to the following: If the employe was serving a probationary period at the time of transfer, his past probation shall apply to the regular probation requirements of the transferee employer. The employe can participate in the pension system of the transferee employer, providing he can meet the qualifications.

Also, it gives the transferee employer the right in determining the comparable position to consider the employe's education, physical qualifications, experience, salary, and duties and responsibilities of his prior employment. In other words, this gives the new employer a great latitude in figuring out how to place these employes. It also says that if the transferee employer can find no comparable position then [it] can offer a lesser position to the transferred employe only if such position is available. If there is no such position available then this employe would go on the regular laid off list of the transferee employer. In the last section the bill provides that at the end of a cooperation agreement the employe shall be entitled to his position with the transferring employer prior to transfer if he has remained an employe of the transferee employer in good standing to the termination of the agreement. *The bill does not guarantee anybody employment whatsoever, but it does give the cities a great deal of latitude which they really need in regards to this situation*." Minutes, Senate Committee on Local Government, April 16, 1963, at 5-6. (Emphasis supplied.)

In sum, the focus throughout the legislative proceedings was on the ease with which public employers could incorporate civil service employees into their workforces. The statute does contain clear language requiring transfers, but that alone is not enough to save it from amendments by future legislatures. It is possible that the AFL-CIO intended HB 1474 to be a bill that would create a contractual obligation on the part of the state, but if that was the goal, it, and the legislature, needed to make that goal considerably clearer than is evidenced by the testimony quoted herein. Having found no persuasive evidence of legislative intention to create a contract by virtue of its enactment of ORS 236.610, I concur with the majority's holding that no statutory contract was impaired by the legislature's subsequent enactment of Senate Bill 1145.