Argued and submitted June 16; petitioners' requests for relief challenging Oregon Laws 2019, chapter 355, sections 1-19 and 39-40, denied August 6, 2020

Jennifer JAMES,
Lisa Riegel, Rosanne Scott, Robert Martineau,
Regina Thompson, Emily Marx, Dustin Andrews,
Brandon Silence, Thomas Cleary,
*Petitioners,*

*v.*

STATE OF OREGON;
State of Oregon by and through
the Department of Human Services and
the Department of Transportation;
Multnomah County; City of Portland;
City of Salem; Oregon Health & Science University;
Mount Hood Community College;
Molalla River School District; and
Public Employees Retirement Board,
*Respondents.*

(SC S066933)

471 P3d 93

Petitioners sought direct judicial review of two statutory amendments to the Public Employees Retirement System (PERS). The first challenged amendment redirects a member's PERS contributions from the member's individual account program—the defined-contribution component of the member's retirement plan—to a newly created employee pension stability account, used to help fund the defined-benefit component of the member's retirement plan. The second challenged amendment imposes a cap on the salary used to calculate a member's benefits. *Held*: (1) The challenged amendments do not impair petitioners' contract rights under the state Contract Clause, Article I, section 21, of the Oregon Constitution, because the amendments do not operate retrospectively to decrease the retirement benefits attributable to work that the member performed before the effective date of the amendments and because, although the amendments operate prospectively to change the offer for future retirement benefits, the preamendment statutes did not include a promise that the retirement benefits would not be changed prospectively; (2) the challenged amendments do not breach petitioners' contract with participating employers; (3) the challenged amendments do not violate the federal Contract Clause, Article I, section 10, clause 1, of the United States Constitution; and (4) the challenged amendments do not constitute an unconstitutional taking of petitioners' property without just compensation in violation of Article I, section 18, of the Oregon Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution.

Petitioners' requests for relief challenging Oregon Laws 2019, chapter 355, sections 1-19 and 39-40, are denied.

En Banc

On petition for review under Oregon Laws 2019, chapter 355, section 65.

Aruna A. Masih, Bennett Hartman, LLP, Portland, argued the cause and filed the briefs for petitioners on review. Also on the brief was Gregory A. Hartman.

Benjamin Gutman, Solicitor General, Salem, argued the cause and filed the brief for respondents State of Oregon and the Public Employees Retirement Board. Also on the brief was Ellen F. Rosenblum, Attorney General.

Daniel Simon, Deputy City Attorney, argued the cause and filed the brief for respondents City of Portland and Multnomah County. Also on the brief were Tracy Reeve, City Attorney, and Robert L. Taylor, Chief Deputy City Attorney.

William F. Gary, Harrang Long Gary Rudnick P.C., Eugene, argued the cause for respondents City of Salem, Oregon Health and Science University, Mount Hood Community College, and Molalla River School District. Sharon A. Rudnick filed the brief. Also on the brief was William F. Gary.

Paul C. Elsner, Beery, Elsner & Hammond, LLP, Portland, filed the brief for *amici curiae* League of Oregon Cities and Association of Oregon Counties. Also on the brief was Ashley O. Driscoll.

WALTERS, C. J.

Petitioners' requests for relief challenging Oregon Laws 2019, chapter 355, sections 1-19 and 39-40, are denied.

**WALTERS, C. J.**

The Public Employees Retirement System (PERS) is a retirement-benefit program for covered public employee members. In 2019, the legislature made various changes to PERS by enacting amendments set out in SB 1049. Or Laws 2019, ch 355. Petitioners are PERS members challenging two of those amendments. Respondents are the state, the Public Employees Retirement Board (the board), and various state and local public employers.

The first amendment that petitioners challenge redirects a member's PERS contributions from the member's individual account program—the defined-contribution component of the member's retirement plan—to a newly created employee pension stability account, used to help fund the defined-benefit component of the member's retirement plan. Or Laws 2019, ch 355, §§ 1-19. The second amendment that petitioners challenge imposes a cap on the salary used to calculate a member's benefits. Or Laws 2019, ch 355, §§ 39-40.

Petitioners primarily argue that the amendments impair their contractual rights and therefore violate the state Contract Clause, Article I, section 21, of the Oregon Constitution. For the reasons that follow, we disagree. The challenged amendments do not operate retrospectively to decrease the retirement benefits attributable to work that the member performed before the effective date of the amendments. And, although the amendments operate prospectively to change the offer for future retirement benefits, the preamendment statutes did not include a promise that the retirement benefits would not be changed prospectively. We resolve petitioners' other claims on similar grounds and deny their requests for relief.

## I.  BACKGROUND

A.  *Jurisdiction and Evidentiary Record*

This court has original jurisdiction to determine whether the PERS amendments contained in SB 1049 breach the contracts between PERS members and their employers or otherwise violate provisions of the state or federal constitution. Or Laws 2019, ch 355, § 65(1). After petitioners filed

a complaint challenging the PERS amendments, the court appointed Senior Judge Marilyn E. Litzenberger to serve as special master. The special master proceedings resulted in a Revised Joint Stipulated Facts and General Stipulations, which includes factual stipulations necessary to establish petitioners' standing. We rely on those stipulations as the evidentiary record in this case.

B.   *PERS Funding and Benefits*

        PERS is administered by the board. Public employees become PERS members after working six months in a qualified position for the state or one of the other 900-plus PERS-participating public employers. ORS 238.015(1); ORS 238A.100(1)(a); ORS 238A.300(1). As of October 2018, there were more than 367,000 members in the PERS system, which includes active, inactive, and retired members. There are three categories of PERS members: Tier One members, Tier Two members, and Oregon Public Service Retirement Plan (OPSRP) members. Whether members fall into one category or another depends on their start date. *Moro v. State of Oregon*, 357 Or 167, 178, 351 P3d 1 (2015). Tier One members were hired before January 1, 1996; Tier Two members were hired from January 1, 1996, to August 28, 2003; and OPSRP members were hired after August 28, 2003. *Id.*

        PERS is a tax-qualified defined-benefit governmental plan, which, since 2004, has included a defined benefit with a defined-contribution component. *Id.* at 176 (distinguishing defined-benefit plans and defined-contribution plans). The defined-benefit component is the service retirement allowance or pension. And the defined-contribution component is the individual account program (IAP).

        The specifics of the defined-benefit component vary depending on whether a member falls in Tier One, Tier Two, or OPSRP. Upon retirement, Tier One and Tier Two members receive a defined benefit in the form of a service retirement allowance calculated using one of three formulas: Full Formula, Formula Plus Annuity, or Money Match. *See Strunk v. PERB*, 338 Or 145, 160-61, 108 P3d 1058 (2005) (detailing the benefit formulas). The Formula Plus Annuity and Money Match formulas calculate a member's service

retirement allowance using, among other things, the amount that the member has contributed to his or her regular or variable accounts, as well as the earnings on those contributions. The Full Formula, on the other hand, calculates a member's service retirement allowance by multiplying the member's final average salary by a statutory factor of 1.67 percent (two percent for police officers and firefighters) and then multiplying the resulting figure by the member's years of service. *Id.* The board uses whichever formula yields the highest pension amount for that member. *Id.* at 161. Today, most Tier One and Tier Two members retire under the Full Formula.

The defined benefit earned by OPSRP members is not as complicated. OPSRP members earn a pension that is calculated in a manner like the Full Formula—by multiplying the member's final average salary by a statutory factor of 1.50 percent (1.8 percent for police officers and firefighters) and then multiplying the resulting figure by the member's years of service.

The defined benefit is funded, to a significant extent, by employer contributions. From 2004 until the amendment at issue here, the service retirement allowance for most Tier One and Tier Two members was funded by employer contributions, pre-2004 member contributions, and earnings on those contributions. The pension for OPSRP members was funded solely by employer contributions and earnings on those contributions. Under SB 1049, some funding for the defined benefit will also come from member contributions.

In addition to the defined benefit, PERS has included a defined-contribution component—the IAP—that is the same for Tier One, Tier Two, and OPSRP members. Since 2004, active members have been required to contribute six percent of their salary to the IAP, which is invested and adjusted annually to reflect earnings and administrative expenses. The member contributions to the IAP may be paid for by the member's participating employer under the terms of certain collective bargaining agreements. ORS 238A.335. At retirement, members can choose to receive the account balance as a lump-sum payment or in installments paid over time.

C.   *Challenged Amendments*

The amendments at issue in this case affect both the defined-benefit and defined-contribution components. As to the latter, for members with a salary over $2,500 a month, the amendments will redirect a portion of a member's salary contributions in years when PERS is less than 90 percent funded. Or Laws 2019, ch 355, §§ 1-19 (the redirection provision). For purposes of the redirection provision, PERS is 90 percent funded when its actuary determines that the relevant assets within PERS are equal to 90 percent of the relevant accrued liabilities. Or Laws 2019, ch 355, § 1(2)(c). PERS is currently less than 90 percent funded and is projected to remain less than 90 percent funded for at least the next 15 years.

During that time, members still will be required to make contributions totaling six percent of their salary, but not all of the contributions will go to members' IAP accounts. Instead, some portion of members' contributions will go toward their IAP accounts and some portion will go toward an "employee pension stability account" (EPSA). Specifically, for Tier One and Tier Two members, 3.5 percent of their salary will be credited to their IAP accounts and 2.5 percent of their salary will go toward an EPSA. Or Laws 2019, ch 355, § 1(2)(a)(B). For OPSRP members, 5.25 percent of their salary will be credited to their IAP accounts and 0.75 percent of their salary will go toward an EPSA. Or Laws 2019, ch 355, § 1(2)(b)(B).

Money in a member's EPSA will be applied to partially fund the cost of the member's defined benefit accrued on or after July 1, 2020. Or Laws 2019, ch 355, § 3(3)(a) (stating that the board will use money from the EPSA "to pay the costs of the pension or other retirement benefits that are payable to the member or the member's beneficiary * * * and that accrue on or after July 1, 2020"). That means that some of the defined-benefit component that a member earns after July 1, 2020, may be funded by new member contributions rather than solely by employer contributions. Money in a member's EPSA will be returned to the member in a lump sum if it "exceed[s] the costs of the pension or other

retirement benefits that are payable to the member or the member's beneficiary." Or Laws 2019, ch 355, § 3(3)(b).

The second challenged amendment imposes a cap on the portion of a member's salary that may be used in calculating the defined-benefit and defined-contribution components of the plan. Or Laws 2019, ch 355, §§ 39-40 (salary-cap provision). For calculations made after January 1, 2020, the definition of "salary" excludes any amounts in excess of the cap for the particular calendar year. The cap is $195,000 for 2020, and the amount of the cap will be adjusted annually to reflect changes in the cost of living. Or Laws 2019, ch 355, § 39(26)(c)(M), § 40(17)(c)(M). The cap has no effect on the salary that a member may receive in a particular year; thus, for example, a member may receive more than $195,000 in salary in 2020. But, for the purposes of calculating PERS benefits, including for calculating IAP contributions and final average salary under the Full Formula and the OPSRP pension program, the member will be credited with having earned only $195,000 in 2020. Before the enactment of SB 1049, PERS contained no salary cap for Tier One members, while Tier Two and OPSRP members were subject to a cap to comply with IRS regulations. OAR 459-005-0525 (2017). In 2019, that cap was $280,000.

By statute, final average salary is the greater of (1) the average of the salary earned in the three years before retirement in which a member was paid the highest salary, or (2) the member's average salary paid over the last 36 calendar months of employment before retirement. ORS 238.005(9); ORS 238A.130(1). The board has adopted rules implementing the salary-cap provision with respect to final average salary. Under OAR 459-005-0525(7), the board will calculate the final average salary "based on the amount of compensation that is allowed to be taken into account under [the salary-cap provision]."

## II. ANALYSIS

Petitioners contend that the redirection and salary-cap provisions in SB 1049 unconstitutionally impair their employment contracts in violation of the state Contract Clause, Article I, section 21, of the Oregon Constitution, and the federal Contract Clause, Article I, section 10, clause 1, of

the United States Constitution. In the alternative, they contend that the amendments breach their contracts and constitute an unconstitutional taking of their property without just compensation in violation of Article I, section 18, of the Oregon Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution.

Respondents rejoin that the challenged amendments do not impair any contractual obligation, because they do not deny a member a contractual PERS benefit that the member already has earned. Similarly, respondents argue, the same analysis applies to petitioners' breach of contract and takings claims and they should be rejected on the same grounds.

A.  *State Contract Clause*

We begin with petitioners' argument under the state Contract Clause, which provides that "[n]o *** law impairing the obligation of contracts shall ever be passed[.]" Or Const, Art I, § 21; *see also Moro*, 357 Or at 192 ("When presented with arguments arising under both state and federal law, we generally attempt to dispose of the case on state law grounds before reaching questions of federal law.").

1.  *Framework*

This court recently analyzed the state Contract Clause's application to PERS benefits in *Moro*. To apply the state Contract Clause, "we consider the potential impairment of contractual obligations arising only from contracts *entered into before* the effective date of the law being challenged." *Moro*, 357 Or at 194 (emphasis in original). Although courts are hesitant to read statutes as creating contractual obligations, this court has "repeatedly held that the legislature intended and understood that PERS benefits are contractual and, as a result, PERS is a contract between a participating employer and its employees." *Id.* at 195 (internal quotation marks and citations omitted).

Like other contracts, the PERS contract results from an offer and an acceptance. "The PERS statutes establish that PERS benefits are a statutorily required term in the offer that each participating employer makes to its

employees." *Id.* at 197. Thus, "each participating employer offers a promise to its employees to provide compensation, including PERS benefits, in exchange for the employees' services." *Id.*

The PERS contract is formed when the employee accepts the offer. *Id.* at 198. An employee "accept[s] the offer by providing the services" that his or her employer sought, resulting in a unilateral contract. *Id.* "The PERS contract reaches only as far as a member has accepted the offer[.]" *Id.* at 201. And, because the employee accepts the offer through performance, "a member's acceptance reaches only as far as the work that the member has performed." *Id.*

After an employee accepts the offer through performance, the employer continues to offer further PERS benefits in exchange for further services from the employee. In that sense, "the PERS offer is a continuing offer." *Id.* at 201. And "PERS members repeatedly accept their employers' PERS offers by continuing to work and thereby earn additional contractual rights to PERS benefits for that additional work." *Id.* at 220. As a result, "[e]ach additional rendition of service accepts any open offer for additional PERS benefits." *Id.* at 201. Because an employee accepts the PERS offer by working, "[t]he PERS contract binds a participating employer to compensate a member for only the work that the member has rendered and based on only the terms offered at the time that the work was rendered." *Id.*

The fact that an employee has accepted an offer of benefits by performing services does not necessarily prevent the employer from changing the terms of the offer for future work. As explained further below, an offer for future work may be changed unless the offer is irrevocable, such as when "one of the express or implied terms offered and accepted included a promise that the participating employers would not change the terms of the offer, even prospectively." *Id.* at 201; *see also Strunk*, 338 Or at 192 n 40 ("The predicate question—which we determine to be dispositive in these cases—is whether the contract offer that the particular pension plan presents *contains* such a promise, *i.e.*, a promise that extends over the life of a covered member's service." (Emphasis in original.)).

As a result, when a member accepts an offer of specified retirement benefits by providing services, the member has earned the right to have those benefits paid after the member retires. And, if the accepted offer also included a component of irrevocability, then the member also has earned the right to continue to earn the specified retirement benefits by performing additional work in the future. A member cannot be denied a contractual PERS benefit that the member already has earned, whether that benefit is the right to specified retirement benefits or the right to continue to earn those benefits in the future.

Amendments to contractual provisions of PERS are therefore assessed along two lines to determine whether they impair a member's contract rights.[1] First, a PERS amendment impairs a member's contract rights if it operates retrospectively to reduce the retirement benefits attributable to work that the member performed before the amendments went into effect. Second, a PERS amendment impairs a member's contract rights if the pre-amendment offer was irrevocable and the amendment operates prospectively to reduce the retirement benefits offered to a member for future work.[2]

This court's decision in *Moro* provides an example of that analysis. There, the court considered the constitutionality of a PERS amendment that reduced the cost-of-living adjustment (COLA) that would be applied to the member's defined-benefit retirement service allowances and pensions. The court explained that, pre-amendment, the statutes had offered members a defined benefit that would be paid on retirement, with the addition of a COLA, up to a specified cap, in each succeeding year. Members who accepted

---

[1] We have previously recognized that "not every provision within the PERS statutory scheme is a term in the PERS contract." *Moro*, 357 Or at 204. There is no dispute in this case, however, that the relevant provisions are contractual.

[2] That impairment-of-contract analysis applies to all categories of PERS members, even though OPSRP members are subject to a legislative reservation of rights that does not apply to Tier One and Tier Two members. *See* ORS 238A.470 ("The Legislative Assembly may change the benefits payable to [OPSRP members] as long as the change applies only to benefits attributable to service performed and salary earned on or after the date the change is made."). That reservation of rights merely codifies the analysis that applies to Tier One and Tier Two members under the common law and the state Contract Clause.

the pre-amendment offer were entitled to receive the defined benefit and the specified COLA attributable to work performed while the pre-amendment offer was in effect. When the legislature amended the statutes, it reduced the COLA without providing that it would apply only to benefits earned after the effective date of the amendment. Therefore, the court determined that the amendment operated both retrospectively to reduce the value of the benefits already earned through past work and prospectively to reduce the value of the benefits offered for future work.

Consequently, the court held that the legislature's retrospective change had impaired petitioners' contractual rights. By completing past work, the members had accepted an offer for a higher COLA with respect to benefits that the members had earned for that work, and the amendment denied members that higher COLA. On the other hand, the court held that the legislature's prospective change in the COLA cap was constitutional as applied to work that members had not yet performed because the earlier offer to pay the higher COLA was not irrevocable. Thus, the court concluded that the legislature did not violate members' contractual rights when it changed the COLA cap in the offer for future benefits attributable to future work. The court observed that PERS members who worked before and after the COLA amendment would "be entitled to receive during retirement a blended COLA rate that reflects the different COLA provisions applicable to benefits earned at different times." *Moro*, 357 Or at 232.

2. *Redirection provision*

In applying that framework, we begin our analysis with the redirection provision of SB 1049. Between 2004 and the effective date of the redirection provision, an active PERS member was required to contribute six percent of his or her salary to PERS, and the entire contribution was credited to the member's IAP—the defined-contribution component of PERS. *Former* ORS 238A.330(1)-(2) (2017). The redirection provision in SB 1049 requires that, under certain circumstances, future member contributions be divided between the member's IAP account and an EPSA. Or Laws 2019, ch 355, § 1(2). And the EPSA may be used to pay the

defined-benefit component of PERS that the member earns after SB 1049 goes into effect—benefits that, without SB 1049, would have been paid for by employer contributions. Or Laws 2019, ch 355, § 3(3)(a).

Petitioners do not argue that the redirection provision operates retrospectively to reduce retirement benefits that they already have earned. The money that a member already has contributed to the IAP account—contributions that are attributable to work already performed—remains in the IAP account. The redirection provision makes no changes to the benefit in that regard. Instead, the redirection provision redirects only *future* member contributions. As a result, the redirection provision operates prospectively to reduce the retirement benefits offered for future work.

Petitioners instead contend that the redirection provision impairs their contract rights because, prior to amendment, the PERS statutes included an irrevocable offer to continue to provide a defined benefit funded solely by employer contributions—at least as to portions of the defined benefit earned beginning in 2004. Petitioners argue that the text and context of the PERS statutes establish both express and implied terms of irrevocability.

To establish that the pre-amendment statutes contained an express term of irrevocability, petitioners rely on three separate statutory provisions. First, petitioners rely on ORS 238.200(4), which provides that a member "is not permitted or required to make employee contributions to the fund for service performed on or after January 1, 2004." Although SB 1049 does not expressly amend that provision, petitioners argue that SB 1049 impliedly amends it. According to petitioners, that provision prohibits members from contributing to the EPSA because a contribution to the EPSA represents a contribution to the fund.[3]

---

[3] Respondents argue that SB 1049 does not impliedly amend ORS 238.200(4), and that there is no conflict between that provision and the redirection provision, because the EPSA is not part of the "fund" referred to in ORS 238.200(4). Neither petitioners nor respondents presented briefing on the meaning of the term "fund," which is defined as "the Public Employees Retirement Fund." ORS 238.005(12). At oral argument, the City of Salem argued that "fund" cannot mean all PERS accounts. According to the City of Salem, the legislature adopted ORS 238.200(4), prohibiting members from contributing to the "fund," during the same session

Second, petitioners rely on *former* ORS 238.300(2)(a) (2017), which provided that Tier One and Tier Two members "shall receive a service retirement allowance which shall consist of * * * [a] life pension (nonrefund) for current service provided by the contributions of employers." SB 1049 amends that provision to provide that Tier One and Tier Two members will receive "[a] life pension (nonrefund) for current service provided by the contributions of employers and, for pension benefits that accrue on or after July 1, 2020, amounts in the employee pension stability account established for the member under section 3 of this 2019 Act." Or Laws 2019, ch 355, § 13(2)(A).

Finally, petitioners rely on *former* ORS 238A.330(2) (2017), which provided that employee contributions by an IAP member—all active Tier One, Tier Two, and OPSRP members—"shall be credited" to the employee's IAP account. SB 1049 amends that provision to provide that employee contributions by an IAP member "shall be credited" to either the member's IAP account or the member's EPSA according to the criteria described above. Or Laws 2019, ch 355, § 1(2).

In relying on those statutes, petitioners confuse the standard for determining whether a benefit that has been offered and accepted is contractually protected with the standard for determining whether a benefit that has been offered is irrevocable. The pre-amendment statutes on which petitioners rely certainly describe benefits that, once earned, were contractually protected. Before SB 1049, participating employers offered the described benefits to members who accepted those offers by providing services. As a result, participating employers are contractually obligated to provide the benefits that members have already earned through work the member has already performed. But nothing in those statutes suggests that the legislature intended

---

that it created the IAP and required that members contribute to the IAP. *See* Or Laws 2003, ch 67, § 1(4), *as amended by* Or Laws 2003, ch 625, § 9 (adopting the current version of ORS 238.200(4)); Or Laws 2003, ch 733, § 32(1) ("A member of the individual account program must make employee contributions to the individual account program of six percent of the member's salary."), *codified as* ORS 238A.330(1). The City of Salem argued that, if the IAP is outside the definition of "fund," then the EPSA could also be outside the definition of "fund." We do not resolve that dispute, because we reject petitioners' argument for irrevocability even if SB 1049 impliedly amends ORS 238.200(4).

those offers to be irrevocable and not subject to change with respect to future work that members have not yet performed.

In *Moro*, this court distinguished between text that made an earned benefit contractual and text that made an offer irrevocable:

> "The legislature's use of 'shall,' without more, is plainly insufficient to establish the irrevocability of an offer. Although this court has considered the use of 'shall' as a factor that can weigh in favor of finding a statutory contract offer, the use of 'shall,' without more, has not been used to establish irrevocability. Consider, for instance, an employer's promise that it 'shall' pay a potential employee $3,000 per month. That promise does not expressly provide that the employer will not change the employee's compensation in the future, nor can we imply from the word 'shall' a promise to maintain that salary without change."

357 Or at 225-26 (internal citations omitted); *see also Strunk*, 338 Or at 192 ("Nothing in the text of ORS 238.200(1)(a) (2001), which required PERS members to contribute six percent of their salaries to the fund, supports petitioners' argument that the legislature intended that contribution to be immutable.").

The standard for establishing an express term of irrevocability is heightened in the context of statutory contracts because "legislatures generally do not intend to bind future legislatures." *Moro*, 357 Or at 226. "An irrevocable statutory offer—particularly one that could involve potentially decades of new and significant financial liabilities— would deviate widely from that general presumption." *Id.* As a result, this court has required an express term of irrevocability to be clear and unambiguous. *See Strunk*, 338 Or at 192-93 ("In other words, the text of ORS 238.200 (1)(a) (2001) and its statutory context do not establish clearly and unambiguously that the legislature intended to promise members that they could contribute six percent of their salaries to their regular accounts throughout their PERS membership so as to maximize their pension component calculation under the Money Match."). Nothing in the provisions identified by petitioners indicates that the legislature made a clear and unambiguous promise, as petitioners contend, that the defined-benefit component of

their retirement benefits always would be funded solely by employer contributions.

Petitioners also argue that the pre-amendment offer of PERS benefits includes an implied term of irrevocability. As we described in *Moro*, "an offer is impliedly irrevocable if the invited form of acceptance takes time to complete and the accepting party is attempting to complete the acceptance." 357 Or at 223. The court noted that "[t]hat type of implied irrevocability might apply, for example, if it takes an employee a year to satisfy the conditions necessary for a retention bonus." *Id.* The term of irrevocability is implied to address the injustice that might result if the accepting party provides partial performance but the offering party then denies the accepting party the opportunity to complete the performance necessary to accept the offer. *Id.*; *see also Taylor v. Mult. Dep. Sher. Ret. Bd.*, 265 Or 445, 452, 510 P2d 339 (1973) (discussing the operation of partial performance).

Petitioners' argument for implied irrevocability, however, makes no effort to establish that it takes time to complete acceptance of the specific IAP benefits that were amended by the redirection provision. Petitioners, instead, reassert an argument that this court expressly rejected in *Moro*—namely, that accepting pension benefits *inherently* takes time to complete. Contrary to petitioners' argument, although acceptance of some pension benefits might take time to complete, that is not true for the acceptance of all pension benefits. *Moro*, 357 Or at 223-24. And, in *Moro*, this court held that the COLA benefits at issue were among those not subject to a term of implied irrevocability:

> "[T]he COLA benefit at issue in this case does not impose conditions on acceptance that take time to complete. As discussed above, the COLA benefit accrues incrementally as a PERS member renders additional service to his or her employer. The member's work continually and serially completes the performance necessary to accrue the benefits attributable to that work[.]"

*Id.* at 224-25.

In reaching that conclusion, the court acknowledged that it had not applied that principle consistently. In *Oregon State Police Officers' Assn. v. State of Oregon*

(*OSPOA*), 323 Or 356, 918 P2d 765 (1996), this court took the position that petitioners assert in this case, relying on *Taylor*. In *Moro*, however, this court "disavow[ed] the reasoning that we applied in *OSPOA*," noting that the reasoning "is not supported by *Taylor* and is inconsistent with our earlier decision in *Hughes* [*v. State of Oregon*, 314 Or 1, 838 P2d 1018 (1992)], with our later decision in *Strunk*, and with the analysis set out" in *Moro* itself. 357 Or at 225. We decline petitioners' request that we revisit that line of cases.

We also observe that this court approved a similar redirection of employee contributions under similar reasoning in *Strunk*. In that case, the court permitted PERS amendments redirecting future member contributions away from the member's regular account and into the IAP. *Strunk*, 338 Or at 191-93. The court noted that, under the pre-amendment PERS statutes, members were required to contribute six percent of their salaries to their regular accounts, and, after the amendment, they were prohibited from contributing to their regular accounts. Although the court held that the pre-amendment provisions were contractual as to benefits already earned for work already performed, the court did not find the pre-amendment provisions irrevocable as to benefits not yet earned for work not yet performed. *Id.* at 192-93. Here, the redirection of member contributions away from the IAP and into the ESPA is no different, and we conclude that it does not violate a term of implied irrevocability.

Finally, petitioners contend that the redirection provision violates trust fund obligations that this court has recognized as "part of the statutory PERS contract." *Arken v. City of Portland*, 351 Or 113, 163, 263 P3d 975 (2011), *opinion adh'd to on recons sub nom Robinson v. Public Employees Retirement Board*, 351 Or 404, 268 P3d 567 (2011). In particular, petitioners maintain that the redirection provision violates a trust principle "prohibiting the diversion of trust fund assets to favor one set of beneficiaries of the trust over another." *Id.* at 164.

In *Arken*, the board had attempted to recoup overpayments made to a set of PERS members—called the "Window Retirees"—by charging the overpayments as

administrative expenses. Doing so would have cancelled the Window Retirees' obligation to repay the overpayments and still made the the Public Employee Retirement Fund (PERF) whole. Those administrative expenses, however, were not paid by money generated only by the Window Retirees. Instead, administrative expenses were paid with money generated by earnings on all Tier One and Tier Two member contributions. *Id.* at 163.

This court rejected that method for correcting the overpayments, explaining that it diverted earnings belonging to all Tier One and Tier Two members to pay for debts owed by only the Window Retirees, allowing the Window Retirees, in effect, to keep the overpayments that they received:

> "[T]he distribution of PERF earnings among the various accounts is a 'zero-sum' matter: If overpayments beyond what should be charged are made to one account, then lesser amounts than should be allocated will be available for payments to other accounts. Here, if overpayments made to the Window Retirees are allocated as administrative expenses of the PERF, then a lesser amount of the PERF earnings will be available for distribution to the reserve accounts or to the accounts of all other PERS members with existing accounts."

*Id.* As a result, this court held that those PERF earnings could be used only "for the benefit of those members whose contributions generated the fund assets," and could not be used to benefit only the Window Retirees. *Id.*

Petitioners contend that the redirection provision at issue in this case is like the diversion of earnings at issue in *Arken*. According to petitioners, the redirection provision reduces employer costs by using some member contributions—those directed to the EPSA—to pay defined-benefit components that would have been paid by employers under the pre-amendment terms. And, according to petitioners, employers may use those savings to pay for existing employer liabilities owed to other PERS members. Petitioners maintain that it violates trust principles described in *Arken* to "divert" their employee contributions from their IAP accounts in order to reduce employer costs associated with general funding

of the system, including benefits attributable primarily to other PERS members—notably, retirees.

Petitioners' argument has no merit: In this instance, there is no diversion of trust assets from one trust beneficiary to another. All member contributions that are subject to redirection will be used to pay for benefits owed to the member who contributed the funds. As noted above, money from a member's EPSA will be used "to pay the costs of the pension or other retirement benefits that are *payable to the member or the member's beneficiary \* \* \** and that accrue on or after July 1, 2020." Or Laws 2019, ch 355, § 3(3)(a) (emphasis added). And, if not used for that purpose, money in the EPSA will be paid to the member or the member's beneficiary in a lump sum. Or Laws 2019, ch 355, § 3(3)(b).

Thus, none of the contributions subject to redirection will be used to benefit anyone other than the member who made the contribution. Although petitioners' argument suggests that already retired members benefit from the redirection of current members' contributions, that suggestion is incorrect. Retired members will receive the same retirement allowances and pensions regardless of the redirection provision.

It is true, however, that participating employers are better off as a result of the redirection provision because some benefits—those earned after the redirection provision takes effect—that would otherwise have been paid by employer contributions will now be paid in part by member contributions. As a result, participating employers will not have to contribute as much to pay for future benefits earned by active members. But *Arken* does not prohibit the legislature from providing them with that benefit. Money that employers are not required to pay into PERS never enters the trust in the first place. And the legislature can relieve them of the obligation to spend nontrust money without violating the trust principles articulated in *Arken*.

As a result, the redirection provision bears no resemblance to the diversion of trust assets at issue in *Arken* and does not violate trust principles. We reject petitioners' argument that the redirection provision impairs petitioners' contract rights.

### 3.   *Salary-cap provision*

We now turn to petitioners' challenge to SB 1049's salary-cap provision. As explained above, that provision amends the definition of "salary" used for the purposes of calculating PERS benefits. Before SB 1049, Tier One members were subject to no such salary cap, while Tier Two and OPSRP members were subject to a higher salary cap, which was $280,000 for 2019. After SB 1049, beginning in 2020, the definition of "salary" will exclude amounts over $195,000. SB 1049 further provides that the cap will be adjusted in future years to account for cost of living adjustments.[4]

Petitioners' objection to the salary cap is based on the fact that the cap will reduce the service retirement allowances and pensions that some members could have otherwise earned. As permitted by statute, the board uses a member's final average salary to calculate both the service retirement allowance under the Full Formula for Tier One and Tier Two members and the pension benefit for OPSRP members. In both instances, the board determines the benefit by multiplying a member's final average salary by a statutory factor and the member's years of service. As noted above, "final average salary" is defined as the greater of (1) the average of the salary earned in the three years before retirement in which a member was paid the highest salary, or (2) the member's average salary paid over the last 36 calendar months of employment before retirement. ORS 238.005(9); ORS 238A.130(1).

The operation of the salary cap can be shown with an example: A Tier Two member worked for a participating employer for 20 years, starting at the beginning of 2002 and retiring at the end of 2021. Through 2018, she earned under $195,000. In 2019, however, she got a raise and made

---

[4] *See* Or Laws 2019, ch 355, § 39(26)(c)(M), § 40(17)(c)(M) (defining "salary" to exclude, "[f]or years beginning on or after January 1, 2020, any amount in excess of $195,000 for a calendar year. If any period over which salary is determined is less than 12 months, the $195,000 limitation for that period shall be multiplied by a fraction, the numerator of which is the number of months in the determination period and the denominator of which is 12. On January 1 of each year, the board shall adjust the dollar limit provided by this subparagraph to reflect any percentage changes in the Consumer Price Index for All Urban Consumers, West Region (All Items), as published by the Bureau of Labor Statistics of the United States Department of Labor.").

$210,000 during the final three years of her employment (2019, 2020, 2021).

Without the salary-cap provision, her top three years of salary would have been the $210,000 of salary that she earned in 2019, 2020, and 2021. Because she made $210,000 in each of those years, her final average salary without the salary-cap provision would have been $210,000. The board would then multiply her $210,000 final average salary by the statutory factor of 1.67 percent and multiply that by her 20 years of service to calculate her service retirement allowance under the Full Formula. In this example, the member's annual service retirement allowance would be $70,140.

The salary-cap provision, however, imposes a cap of $195,000 beginning in 2020. The member would still receive her salary above $195,000 for her final three years of service, but, for the purposes of calculating her final average salary, the board would apply the cap to the salary that she earned after the salary-cap provision went into effect—in and after 2020. As a result, the board would calculate her final average salary by crediting her full $210,000 salary for 2019, which she earned before the cap was in place, and her capped salary of $195,000 for 2020 and 2021, which she earned after the cap was in place. Using that approach, the board would calculate her final average salary as $200,000—the average of $210,000 (2019), $195,000 (2020), and $195,000 (2021). The board would then multiply her $200,000 final average salary by the statutory factor of 1.67 percent and multiply that by her 20 years of service to calculate her service retirement allowance under the Full Formula. In this example, the member's annual service retirement allowance would be $66,800.[5]

> a.  *Whether the salary-cap provision reduces earned retirement benefits*

As noted above, one way that a PERS amendment can impair a member's contract rights is if it operates

---

[5] This example and the variations of the example below ignore the fact that, under SB 1049, the board would adjust the salary cap to account for changes to the cost of living.

retrospectively to reduce the retirement benefits that a member already has earned—that is, retirement benefits attributable to work that the member performed before the amendments went into effect. Determining whether an amendment reduces retirement benefits that already have been earned requires comparing the retirement benefit that a member would be entitled to receive for work completed before the amendment went into effect with the retirement benefit that the member would be entitled to receive for that same work thereafter.

That SB 1049 does not have that effect is best shown by returning to the example above. Using that example, we can assume that the member earned $175,000 in 2017 and 2018, before getting her raise to $210,000 in 2019. At the end of 2019, when the salary-cap provision went into effect, her final average salary would be $186,667 because the salary from her three highest years would be $175,000 from 2017, $175,000 from 2018, and $210,000 from 2019. And, at that point, she would have worked for 18 years. As a result, the retirement benefits attributable to work that she performed between the start of 2002 and the end of 2019 would be $186,667 x 1.67 percent x 18 years, which is an annual service retirement allowance of $56,112.10.

The amendment in SB 1049 would not result in a reduction of that allowance. Beginning at the start of 2020, the salary-cap provision would go into effect and the member in the example would continue to work. The member's final average salary at the end of 2020 would go up to account for the fact that she worked another year and that she earned $210,000 during that year. Because the salary-cap provision would be in effect in 2020, the member would get credit only for $195,000 of the salary that she earned during that year in calculating her PERS benefit. As a result, her three years of highest salary would be $175,000 from 2018, $210,000 from 2019, and $195,000 from 2020. That gives her a final average salary of $193,333. Therefore, the retirement benefits attributable to the work that she performed between the start of 2002 and the end of 2020 is $193,333 x 1.67 percent x 19 years, which is an annual service retirement allowance of $61,344.56. That is more than what she would have been

owed at end of 2019, before the salary-cap provision went into effect.

The example member's retirement benefits would continue to go up for work that she performed through the end of 2021, when she retired. As explained above, her annual service retirement allowance at that point would be $66,800. The difference between what she was owed at the end of 2019 and what she was owed at the end of 2021 is attributable to the work that she performed during 2020 and 2021, after the salary-cap provision went into effect. Thus, after the salary-cap provision went into effect, she increased her annual service retirement allowance by $10,687.90.

If the salary-cap provision had not taken effect, the member would have increased her annual service retirement allowance even further during 2020 and 2021. Without the salary-cap provision, the member would have increased her annual service retirement allowance by $14,027.90 during 2020 and 2021. The member would have received a greater annual service retirement allowance had the amendment not taken effect, but that consequence is attributable to the value of the services performed after the amendment. The salary-cap provision thus operates prospectively to reduce the retirement benefits offered to members for work performed after its effective date; the salary-cap provision does not operate retrospectively to reduce the retirement benefits that members earned before its effective date.

In sum, calculating a member's retirement benefit using post-amendment-salary increases allows a member's retirement to increase each year to reflect the incremental benefit attributable to the additional work performed and the additional salary earned. But the salary-cap provision does not reduce the retirement benefit attributable to the work previously performed and the salary previously earned. Rather, the salary-cap provision limits only the extent to which that incremental benefit can increase the amount owed to the member. Thus, the salary-cap provision functions prospectively to reduce the retirement benefits offered for future work.

b.   *Whether the salary-cap provision violates an irrevocable offer*

That is not the end of our analysis, however. Because the salary-cap provision reduces the retirement benefits offered to members for future work, it impairs members' contract rights *if* the pre-amendment definition of "salary" was irrevocable. As described above, an offer can be either expressly or impliedly irrevocable. Petitioners argue that the pre-amendment definition of "salary" was both.

In support of an express term of irrevocability, petitioners point out that the formula used to calculate a member's defined benefit—whether a service retirement allowance or pension—is a core pension benefit that is unambiguously contractual. And, petitioners maintain, because the definition of "salary" plays a key role in that calculation formula, the pre-amendment definition of "salary" is equally contractual.

Like petitioners' argument for irrevocability with respect to the redirection provision, petitioners' argument here confuses contractual terms and irrevocable terms. At most, petitioners' argument establishes that, to the extent that it is used to determine benefits attributable to pre-amendment work, the pre-amendment definition of "salary" is contractual. Petitioners do not demonstrate that the legislature promised that that definition would not be revoked with respect to future offers for future work. As noted above, an offer of express irrevocability must be clear and unambiguous. Petitioners point to nothing in the pre-amendment definition of "salary" or any other aspect of the PERS statutes that clearly and unambiguously promises not to change the definition of "salary" with regard to future benefits. There is, therefore, no express term of irrevocability.

In support of an implied term of irrevocability, petitioners argue that, because a final average salary is not calculated until the member retires, the final-average-salary component of the retirement benefit takes time to complete and is, therefore, impliedly irrevocable. We reject petitioners' argument, which we see as a reformulated version of the argument for irrevocability that we rejected in *Moro*.

Retirement benefits are almost always calculated at retirement. The question is not when the benefits are calculated. Instead, the question is when the offers for benefits are accepted—and, in particular, whether the offers for benefits "impose conditions on acceptance that take time to complete." *Moro*, 357 Or at 224. This court identified a retirement benefit that took time to complete in *Taylor*, "which required employees to work for 20 years before vesting." *Moro*, 357 Or at 223. The employee in that case, therefore, was required to work for 20 years before completing the acceptance of the retirement benefit offered.

A final average salary is not like the vesting requirement in *Taylor*. Instead, a final average salary is like the COLA benefit at issue in *Moro*, which "accrues incrementally as a PERS member renders additional service to his or her employer." *Id.* at 224. As demonstrated with the example above, when a member earns a higher salary, the member incrementally increases the final average salary used to calculate the retirement benefits that the member has earned. Unlike the employee in *Taylor*, the member can choose not to continue working and will still be entitled to receive retirement benefits attributable to the work that the member has already completed. In that sense, "[t]he member's work continually and serially completes the performance necessary to accrue the benefits attributable to that work, thus eliminating the concern of uncompensated work that drove this court's analysis in *Taylor*." *Moro*, 357 Or at 225.

We therefore reject petitioners' argument that preamendment definition of "salary" contains an implied term of irrevocability limiting the extent to which employers may change an offer for a benefit that has not yet been earned. As a result, like the redirection provision, the salary-cap provision does not violate the state Contract Clause.

c.   *Blending the highest average salary*

Finally, petitioners argue—presumably to ensure that the salary-cap provision operates prospectively only— that the salary-cap provision must be implemented in a particular manner that blends two different highest average salaries. Under petitioners' proposed approach, the board

would calculate a member's final average salary as if the salary-cap provision never went into effect and weight that final average salary according to the number of years that a member had worked before the salary cap was in place. And then the board would calculate a member's final average salary as if the salary-cap provision had always been in effect and weight that according to the number of years that a member worked while the salary cap was in place.

We return to our example from above, where a Tier Two member retired at the end of 2021 after working for 20 years. She earned a salary of $175,000 in 2017 and 2018. And she earned a salary of $210,000 in 2019, 2020, and 2021. Under petitioners' approach, the board would calculate the member's service retirement allowance under the Full Formula using two calculations. First, petitioners would use the member's final average salary of $210,000, as if the salary-cap provision had never been in effect, multiply that by the statutory factor of 1.67 percent, and multiply that by the 18 years of service that the member completed before the salary-cap provision went into effect. Second, petitioners would use the member's final average salary of $195,000, as if the salary-cap provision had always been in effect, multiply that by the statutory factor of 1.67 percent, and multiply that by the two years of service that she completed after the salary cap was imposed. Petitioners would then add the resulting numbers together to get the member's annual service retirement allowance, which would be $69,639.

Petitioners' approach breaks down the member's years of service into two segments, intending to represent the time that the member worked before and after the salary-cap provision. The problem with petitioners' approach is that the segments are a mix of benefits attributable to work performed both before and after the salary-cap provision went into effect.

Petitioners' approach requires applying a final average salary of $210,000 to the member's first 18 years of service—that is, before the salary-cap went into effect— which results in an annual service retirement allowance of $63,126. But, as described above, when the member completed her first 18 years of service, she had earned a highest

average salary of only $186,667, because the salary from her three highest years would have been $175,000 from 2017, $175,000 from 2018, and $210,000 from 2019. That would result in an annual service retirement allowance of $56,112.10. In this example, petitioners' approach leads to a greater benefit because it calculates the highest average salary using salary that the member earned in 2020 and 2021, after the salary-cap provision went into effect. In other words, the greater benefit calculated under petitioners' approach is attributable to work performed *after* the salary-cap provision took effect. In that regard, petitioners' approach operates prospectively, affecting the value of the benefits that a member can earn after the salary-cap provision took effect.

Thus, petitioners' approach is not necessary to avoid retrospectively decreasing retirement benefits attributable to the work performed before the salary-cap provision took effect.[6] Instead, petitioners' approach operates prospectively, and failing to apply petitioners' approach would impair a member's contract rights only if the pre-amendment definition of salary or some other PERS provision included some aspect of irrevocability. For the reasons described above, we conclude that they did not.

Without grappling with that impediment, petitioners nevertheless repeatedly assert that, in *Moro*, this court "mandated" the blended approach that they claim is required here. To support that assertion, petitioners cite a footnote in which the court stated, "We do not decide, nor have we been asked to decide, the proper manner for calculating an appropriate blended rate." *Moro*, 357 Or at 232 n 36. The court then cited, as an example, a statute that uses a blended-rate formula to apply a tax offset provision to PERS benefits. *Id.*; *see* ORS 238.364(5) (calculating the blended rate resulting

---

[6] If the salary-cap provision were applied to limit to $195,000 the final average salary of a member who had earned more than that amount for one or more years before the amendment—and who had then retired after the amendment— its effect would be retroactive and it would appear to change the terms of the contract which the member had accepted when she worked before the amendment at a salary of more than $195,000. However, the salary-cap provision avoids those problems by providing that all the pre-amendment years in which her salary was more than $195,000 will be used in calculating her final average salary regardless of when she retires.

from the tax exemption repeal by "divid[ing] the number of years of creditable service performed before [the repeal of the tax exemption], by the total number of years of creditable service during which the pension income was earned").

Petitioners' argument, however, fails to consider the difference between this case and *Moro*. As we explained above, the COLA cap in *Moro* had both retrospective and prospective elements. The pre-amendment COLA offer was accepted and earned at the time that the pre-amendment services were provided and, as a matter of contract, that COLA had to be provided for those years of service. The post-amendment COLA also was accepted and earned when the post-amendment services were provided and that was the COLA that had to be provided for those years of service. A blended rate was necessary.

Final average salary is very different. As explained, post-amendment increases to the final average salary are attributable only to post-amendment work. A member increases a retirement allowance by providing additional work that earns a higher salary, much the same way a member increases the allowance by continuing to work and adding to the years of service used in calculating the benefit. An amendment changing the definition of final average salary precludes a member from increasing the benefits that the member may earn, but it does not reduce the benefits that the member already has earned. A blended approach is not necessary when an amendment operates only prospectively. We conclude that the blended approach for which petitioners argue is not required to ensure that the salary-cap provision does not violate the state Contract Clause.

B.  *Other Claims*

In addition to arguing that SB 1049 violates the state Contract Clause, petitioners argue that SB 1049 violates the federal Contract Clause of the United States Constitution, US Const, Art I, § 10, breaches their PERS contracts, and violates the takings provisions of the Oregon Constitution and the United States Constitution, Or Const, Art I, § 18; US Const, Amends V, XIV. Our analysis above resolving the state Contract Clause issue also resolves petitioners' remaining claims. The state Contract Clause was

based on the federal Contract Clause and the two apply equally to the claims at issue in this case. *Moro*, 357 Or at 192-93 (noting that the federal Contract Clause applies the same retrospective/prospective distinction applied under the state Contract Clause). And, in concluding that SB 1049 did not impair petitioners' contract rights, the analysis above similarly resolves petitioners' breach of contract claim and "obviates the fundamental premise" of petitioners' takings claims. *Strunk*, 338 Or at 238.

C.   *Motion to Dismiss*

Finally, two respondents, the City of Portland and Multnomah County, argue that they are not proper parties to this lawsuit and have moved to be dismissed. In asserting that argument, they rely on the direct review provision of SB 1049 that provides this court with jurisdiction to hear this matter. Section 65(3) of that provision requires a petitioner challenging the bill to serve a copy of the petition on PERB, the Attorney General, and the Governor. And section 65(5) requires the Supreme Court to allow participating employers to intervene in any such direct review proceeding. Portland and Multnomah County read those provisions together to mean petitioners are prohibited from suing anyone other than PERB, the Attorney General, and the Governor, and that participating employers may be parties to this lawsuit only by intervening.

The text of those provisions does not support the reading offered by Portland and Multnomah County. Section 65(3) merely states who must be served with the petition. It does not preclude suing anyone. Section 65(5) merely authorizes participating employers to intervene. It does not protect anyone from suit. To be sure, the legislature has included those same provisions in the PERS amendments at issue in *Moro*. Or Laws 2013, ch 53, § 19(3), (5). And, in that case, numerous participating employers were sued as respondents. If the legislature had intended a different result in this case, it would have written the jurisdictional provision differently. We therefore deny the motion to dismiss.

Petitioners' requests for relief challenging Oregon Laws 2019, chapter 355, sections 1-19 and 39-40 are denied.