Argued and submitted February 22; reversed and remanded on appeal, cross-appeal dismissed as moot April 27; petition for review denied September 16, 2022 (370 Or 214)

COUNTY OF LINN,
on behalf of itself and
others similarly situated,
*Plaintiff-Respondent
Cross-Appellant,*

*v.*

STATE OF OREGON
and State Forestry Department,
an Oregon administrative agency,
*Defendants-Appellants
Cross-Respondents.*

Linn County Circuit Court
16CV07708; A173658

510 P3d 962

In this case involving a claim for breach of a purported statutory contract, specifically ORS 530.050, defendants appeal a judgment entered in favor of plaintiffs. On appeal, defendants contend that the trial court erred when it denied their motion to dismiss. In their motion to dismiss, defendants contended that ORS 530.050 did not create a contractual obligation on the part of defendants to manage certain forestlands so as to maximize revenue generated from those forestlands. *Held*: The relevant language in ORS 530.050 was originally enacted in 1941 by Oregon Laws 1941, chapter 236, section 5. The Court of Appeals concluded that the standard of "clear and unmistakable intent" was not met with regard to whether the 1941 Legislative Assembly intended defendants' obligation regarding forest management under Oregon Laws 1941, chapter 236, section 5, to be a term in a statutory contract between plaintiffs and defendants.

Reversed and remanded on appeal; cross-appeal dismissed as moot.

Thomas McHill, Judge.

Benjamin Gutman, Solicitor General, argued the cause for appellants-cross-respondents. Also on the briefs were Ellen F. Rosenblum, Attorney General, Carson L. Whitehead, Assistant Attorney General, and Christopher A. Perdue, Assistant Attorney General.

John A. DiLorenzo, Jr., argued the cause for respondent-cross-appellant. Also on the combined answering and

cross-opening brief were John F. McGrory, Jr., Gregory A. Chaimov, Aaron K. Stuckey, Kevin H. Kono, Christopher Swift, Alicia Leduc, Trinity Madrid, and David Wright Tremaine LLP. Also on the reply brief were John F. McGrory, Jr., Gregory A. Chaimov, Carol J. Bernick, Aaron K. Stuckey, Kevin H. Kono, Chris Swift, Trinity Madrid, and Davis Wright Tremaine LLP.

Ralph O. Bloemers and Crag Law Center filed the brief *amici curiae* for Northwest Guides & Anglers, North Coast Communities for Watershed Protection, Oregon Wild, Native Fish Society, Wild Salmon Center, Cascadia Wildlands, Center for Biological Diversity, Umpqua Watersheds and Beyond Toxics.

Ryan P. Steen, Kirk B. Maag, Crystal S. Chase, and Stoel Rives LLP filed the brief *amicus curiae* for Oregon Forest & Industries Council.

Rob Bovett and Lauren Smith filed the brief *amicus curiae* for Council of Forest Trust Land Counties.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Kistler, Senior Judge.

TOOKEY, P. J.

Reversed and remanded on appeal; cross-appeal dismissed as moot.

**TOOKEY, P. J.**

In 2016, plaintiff Linn County brought this class action against defendants, the State of Oregon and the State Forestry Department, alleging a single claim of breach of contract and seeking over $1 billion in damages.

Linn County's complaint alleged that it and other Oregon counties had transferred forestlands to the state pursuant to Oregon Laws 1939, chapter 478, *amended by* Oregon Laws 1941, chapter 236, *codified as amended* at ORS 530.010 to 530.181 (the Act); that the Act required the state to return to the counties a specified portion of the revenues derived from defendants' management of those forestlands; that defendants had a contractual obligation under the Act to manage the forestlands in a manner so as to "maximize the potential revenue that should be generated" from the forestlands; and that defendants breached that contractual obligation by failing to manage the forestlands so as to maximize revenue.

Defendants moved to dismiss on the ground that the Act did not create a contractual obligation on the part of defendants to manage the forestlands so as to maximize revenue. After denying the motion, the trial court certified a plaintiff class comprising the fifteen Oregon counties that transferred land to the state pursuant to the Act, as well as certain governmental entities with whom those counties share such revenue.

The case was tried to a jury, which found in favor of plaintiffs, awarding them over $1 billion in damages for past and future economic losses. Defendants appeal the resulting judgment, raising 28 assignments of error.

Because it is dispositive, in this opinion we address defendants' seventh assignment of error, in which they assert that the trial court erred in denying defendants' motion to dismiss. In their motion to dismiss, as noted, defendants argued that they did not have a contractual obligation under the Act to manage the forestlands to maximize revenue. As addressed below, analyzing that assignment of error requires that we consider the obligations owed by the state to various Oregon counties with regard to lands acquired by

the state under the Act. Specifically, as explained below, we must consider whether the provision in Oregon Laws 1941, chapter 236, section 5, *codified as amended* at ORS 530.050, requiring the Board of Forestry (the Board) to manage certain lands "so as to secure the greatest permanent value of such lands to the state," is a term in a statutory contract between the state, on the one hand, and various Oregon counties, on the other.

Considering the text, context, and legislative history of the provision of Oregon Laws 1941, chapter 236, section 5, requiring the Board to manage lands transferred by counties to the state under the Act "to secure the greatest permanent value of such lands to the state," we conclude that that provision is not a term in a statutory contract between the state, on the one hand, and various Oregon counties, on the other. Accordingly, we reverse and remand.[1]

---

[1] On appeal, defendants raise other potentially-dispositive issues. Two such issues bear mentioning here.

First, defendants argue that *Stovall v. State of Oregon*, 324 Or 92, 922 P2d 646 (1996), "expressly forbids a county from suing the state for damages for breach of a statutory contract." Plaintiffs respond, among other points, that *Stovall* "applies only to statutes relating to a 'public object' and does nothing to limit rights counties hold as corporate bodies, including their rights to hold, convey, and enter contracts regarding county property." Thus, in plaintiffs' view, *Stovall* is inapposite.

Second, defendants argue that, because "Linn County's suit is in essence a rule challenge, only the Court of Appeals has jurisdiction over the matter." Defendants recognize that, under *Hay v. Dept. of Transportation*, 301 Or 129, 719 P2d 860 (1986), an administrative rule can be "at issue in a separate civil action," but they argue that that can occur only in "rare circumstances." Plaintiffs respond that they are not challenging the validity of the administrative rule, as such; rather, they are contending that the Board's application of that rule violates their contractual rights. Additionally, plaintiffs argue that, under *Hay*, circuit courts "may determine the validity of an administrative rule as part of a civil claim over which it otherwise has jurisdiction, such as this breach of contract claim." Thus, in plaintiffs' view, the circuit court had jurisdiction in this case.

This opinion addresses and resolves defendants' seventh assignment of error, which presents a dispositive legal question. We do not address—and our opinion should not be read to answer—the other potentially dispositive issues in this case, including the two mentioned in this footnote, because some of those other assignments may fail on the merits and because our resolution of the seventh assignment of error resolves those assignments that otherwise may have merit.

Additionally, in a cross-appeal, plaintiffs seek reversal of the trial court's ruling striking plaintiffs' request for prejudgment interest and "entry of a judgment adjusted to reflect the prejudgment interest that the State should pay at the statutory rate." In light of our disposition, we dismiss plaintiffs' cross-appeal as moot.

## I.  BACKGROUND

A.  *The State, the Counties, and Management of Oregon's Forestlands*

Oregon counties and the state have a long history of cooperation in the management of Oregon's forestlands.

In 1911, the legislature created the Board, which was responsible for appointing a State Forester. Or Laws 1911, ch 278, §§ 1, 2. The 1911 enactment provided that the State Forester "shall execute all matters pertaining to forestry within the jurisdiction of the State," and required the State Forester to, among other actions, "co-operate with land owners, counties or others in forest protection." *Id.* § 2.

In 1931, the legislature enacted legislation authorizing the Board to acquire lands from Oregon counties. Under that enactment, the Board was authorized to acquire land via "gift" or "purchase," or "transfer of title to the state by any county," as long as such lands were "suited chiefly" for "[g]rowing forest crops, water conservation, watershed protection, [or] recreation." Or Laws 1931, ch 93, §§ 1, 2. Lands acquired under the 1931 enactment were to be "administered and managed by the state board of forestry for any or all of the following purposes: (a) Continuous forest production and so far as practicable to promote sustained yield forest management for the forest units of which such lands are a part; (b) water conservation or watershed protection; [or] (c) recreation." *Id.* § 3.

With regard to land acquired by the state under the 1931 enactment, the 1931 enactment required the state to pay to the counties "5 cents per acre annually and 12 1/2 per cent of all revenues received from said lands." *Id.* § 5.

A new scheme for acquiring forestlands—the Act—was enacted in 1939, Oregon Laws 1939, chapter 478, and the Act was amended by Oregon Laws 1941, chapter 236, in 1941.

Currently, the Act is codified at ORS 530.010 to 530.181. The Act authorizes counties to convey land to the Board, and such land is then designated as state forest. ORS 530.010; *see also Tillamook Co. v. State Board of Forestry*,

302 Or 404, 407-09, 730 P2d 1214 (1986) (describing the statutory scheme). As was the case under the 1931 enactment, under the Act, the state bears certain management responsibilities for that land, and the state and the county that conveyed the land to the state divide revenues derived from that land under a statutory distribution formula. ORS 530.050 (setting forth management responsibilities of the State Forester); ORS 530.110 (setting forth distribution formula for revenue derived from land acquired under the Act).

Because they are central to our analysis of defendants' seventh assignment of error, we next set forth the relevant provisions of the 1941 Act.

B. *The 1941 Act*

Under section 1 of the 1941 Act, the Board was authorized to "acquire, by purchase, donation, devise or exchange" from any "public, quasi-public or private owner" land that was "chiefly valuable for the production of forest crops, watershed protection and development, erosion control, grazing, recreation or forest administrative purposes." Or Laws 1941, ch 236, § 1.[2] The Board, however, was prohibited from acquiring land without the approval of the county in which such lands were situated. *Id.* Land acquired under section 1 was designated as "state forests." *Id.*

Section 3 of the 1941 Act authorized Oregon counties "to convey to the state for state forests any lands heretofore or hereafter acquired by such county *** in consideration

---

[2] Oregon Laws 1941, chapter 236, section 1, provided, in relevant part:

"The state board of forestry, hereinafter referred to as the board, hereby is authorized and empowered in the name of the state of Oregon to acquire, by purchase, donation, devise or exchange from any public, quasi-public or private owner, lands which by reason of their location, topo-graphical, geological or physical characteristics are chiefly valuable for the production of forest crops, watershed protection and development, erosion control, grazing, recreation or forest administrative purposes; provided, that the board shall not acquire any land without prior approval, duly made and entered, of the county court or board of county commissioners of the county in which the lands are situated. Lands so acquired under the provisions of this act shall be designated as state forests; provided, that in counties where land classification committees have been appointed, in accordance with chapter 4 of this title, no lands shall be so acquired unless they have been classified for the purposes above enumerated."

Oregon Laws 1941, chapter 236, section 1 is *codified as amended* at ORS 530.010.

of the payment to such county of the percentage of revenue derived from such lands as provided in section 9 of this act."[3] Section 9 of the 1941 Act, in turn, provided a distribution formula for "all revenues derived from lands acquired from counties pursuant to section 3."[4] Under the formula set forth in section 9, after five cents per acre was deducted, 75 percent of all revenue derived from land acquired from counties was to go to the counties, and 25 percent was to be retained by the state. *Id.* § 9.

Section 5 of the 1941 Act directed how the Board was to manage lands acquired under the Act, which, in this opinion, we refer to as the "management standard." That

---

[3] Oregon Laws 1941, chapter 236, section 3, provided:

"The county court or board of county commissioners of any county hereby is authorized and empowered, in its discretion, to convey to the state for state forests any lands heretofore or hereafter acquired by such county through foreclosure of tax liens, or otherwise, which are within the classification of lands authorized to be acquired under the terms of this act, if the board deems such lands necessary or desirable for acquisition, in consideration of the payment to such county of the percentage of revenue derived from such lands as provided in section 9 of this act. In connection with any such conveyance the board shall have authority to make equitable adjustments with any county of accrued delinquent fire patrol liens on lands heretofore or hereafter acquired by such county by foreclosure of tax liens."

Oregon Laws 1941, chapter 236, section 3 is codified as amended at ORS 530.030.

[4] Oregon Laws 1941, chapter 236, section 9, provided:

"All revenues derived from lands acquired from counties pursuant to section 3 hereof shall be paid into the general fund of the state of Oregon and shall be credited by the state treasurer as follows, and for which purposes said funds hereby are appropriated:

"(a) A sum equal to five (5) cents per acre of said lands per annum from the date of enactment of this act shall be credited to the forest patrol account.

"(b) Seventy-five per cent of the balance thereof shall be credited to the county in which the lands are situated and shall be paid annually to said county by warrant of the secretary of state, pursuant to claim therefor, duly approved by the board, and shall be by said county prorated and apportioned as the same would have been had the lands from which said revenues are derived been sold by said county.

"(c) Twenty-five per cent of said balance shall be credited to the state forest development fund."

Oregon Laws 1941, chapter 236, section 9 is *codified as amended* at ORS 530.110.

Additionally, with respect to lands conveyed before the 1941 amendment—such as those conveyed under the 1939 version of the Act—the legislature provided that the distribution formula as it existed at the time of the conveyance would continue to apply unless the county approved the change in the distribution formula. Or Laws 1941, ch 236, § 12.

section of the 1941 Act provided that the Board "shall manage the lands acquired pursuant to this act *so as to secure the greatest permanent value of such lands to the state*" and, to that end, authorized and empowered the Board to engage in certain acts. *Id.* § 5 (emphasis added).[5] Among those acts, the Board was authorized and empowered to "protect said lands from fire, disease and insect pests"; "sell forest products from said lands"; execute contracts for "mining and removal of minerals and fossils"; "permit the use of said lands for grazing, recreation and other purposes when, in the opinion of the board, such use is not detrimental to the purposes of this act"; and "do all things and to make all rules and regulations, not inconsistent with law, necessary or convenient for the management, protection, utilization and conservation of said lands." *Id.* The management standard in section 5 of the 1941 Act governed management of *all* land acquired under the Act, including land acquired from private parties by "purchase, donation, devise or exchange," *id.* §§ 1, 5, as well as land conveyed to the state by Oregon counties.

---

[5] Oregon Laws 1941, chapter 236, section 5 provided, in relevant part:

"1.  The board shall manage the lands acquired pursuant to this act so as to secure the greatest permanent value of such lands to the state, and to that end is empowered and authorized:

"(a)  To protect said lands from fire, disease and insect pests, to cooperate with the several counties of the state and with persons, firms and corporations owning lands within the state in such protection and to enter into all agreements necessary or convenient therefor.

"(b)  To sell forest products from said lands; to make and execute contracts, for periods in no case exceeding 10 years, for the mining and removal of minerals and fossils in said lands.

"(c)  To permit the use of said lands for grazing, recreation and other purposes when, in the opinion of the board, such use is not detrimental to the purposes of this act.

"(d)  To grant easements and rights of way over, through and across the said lands.

"(e)  To reforest said lands and to cooperate with the several counties of the state, and with persons, firms and corporations owning timber lands within the state in such reforestation, and to make all agreements necessary or convenient therefor.

"(f)  To require such undertakings as in the opinion of the board are necessary or convenient to secure performance of any contract entered into under the terms of this act.

"(g)  To do all things and to make all rules and regulations, not inconsistent with law, necessary or convenient for the management, protection, utilization and conservation of said lands."

C.  *Counties Transfer Land to the State Under the Act, and
    the State Shares Revenue with the Counties*

Over the ensuing decades, 15 Oregon counties conveyed hundreds of thousands of acres of land to the state pursuant to the Act, which then became state forests. The Board has managed those lands in cooperation with the counties and has shared revenue generated from management of those lands with the counties pursuant to the distribution formula set forth in the Act. Although the Act has been amended from time to time, the management standard requiring that the Board "shall manage" land acquired under the Act "so as to secure the greatest permanent value" of such lands "to the state" has not changed since 1941, and as noted, is currently codified at ORS 530.050.[6]

D.  *The Board Promulgates the Greatest Permanent Value
    Rule*

In 1998, the Board promulgated OAR 629-035-0020 (the GPV Rule). The GPV Rule defines "greatest permanent value," as that term is used in ORS 530.050, to mean "healthy, productive, and sustainable forest ecosystems that over time and across the landscape provide a full range of social, economic, and environmental benefits to the people of Oregon." OAR 629-035-0020(1). It directs the State Forester to maintain forestlands and "actively manage them in a sound environmental manner to provide sustainable timber harvest and revenues to the state," but also provides that that focus is "not exclusive of other forest resources," and must be pursued "within a broader management context," which includes a variety of environmental goals. OAR 629-035-0020(2).

E.  *The Instant Litigation*

In 2016, Linn County brought the instant action against defendants. Linn County alleges that the legislature's

_____

[6] The current version of ORS 530.050 directs the State Forester, under the direction of the Board, to "manage the lands acquired pursuant to ORS 530.010 to 530.040 so as to secure the greatest permanent value of those lands to the state." ORS 530.050 ("Under the authority and direction of the State Board of Forestry except as otherwise provided for the sale of forest products, the State Forester shall manage the lands acquired pursuant to ORS 530.010 to 530.040 so as to secure the greatest permanent value of those lands to the state ***[.]").

1939 and 1941 enactments constituted contractual offers; that the counties' subsequent conveyances of lands to the state pursuant to the Act constituted acceptance of the contractual offers; that from 1941 to the present, the Act has mandated—and defendants were contractually obligated to provide—management of the forestlands acquired under the Act "so as to secure the greatest permanent value" of that land; and that defendants breached that contractual obligation by implementing "management plans in reliance upon the GPV Rule that fail to maximize the potential revenue that should be generated" from the land acquired under the Act.[7]

Defendants moved to dismiss the complaint, arguing, among other points, that "plaintiff has not pleaded a clear and unmistakable term of a statutory contract that required defendants to maximize revenue for the benefit of plaintiff." The trial court denied the motion to dismiss, reasoning that "ORS 530.030 - 530.110 clearly sets out the elements of contract including transfer of title in land by the counties *in consideration for* certain promises to perform by the state"; that "the meaning of the contract term 'greatest permanent value to the state' is the gravamen of this case"; that that term was "to some extent vague"; and that the meaning of that term was a question for the trier of fact.

Subsequently, as noted above, the trial court then certified a plaintiff class comprising 15 Oregon counties that transferred land to the state under the Act, as well as governmental entities with whom those counties share such revenue. A jury found in favor of plaintiffs on their claim for breach of contract and awarded plaintiffs over $1 billion for past and future economic losses. Defendants now appeal the resulting judgment, assigning error to, among other rulings, the trial court's denial of their motion to dismiss.

## II.  ANALYSIS

For the purposes of our analysis, the dispositive issue presented by defendants' seventh assignment of error

---

[7] Linn County contends that, when "the contract was made," the phrase "greatest permanent value" was understood to require defendants to "maximize the potential revenue" from the land that the state acquired from the counties.

is whether the Board's obligation to manage certain forest-lands "so as to secure the greatest permanent value of those lands to the state," presently codified at ORS 530.050, is a term in a statutory contract between the state, on the one hand, and various Oregon counties, on the other. Plaintiffs say yes; defendants say no.

More specifically, on appeal, plaintiffs start from the premise that the existence of a statutory contract under the Act is "no longer in dispute." They argue that the "'greatest permanent value' mandate" in ORS 530.050, originally set forth in Oregon Laws 1941, chapter 236, section 5, is a part of that statutory contract because it is a "mandatory" term—insofar as it uses the word "shall"—and that it is "remunerative and essential to the purpose of the contract because it is the sole source of the State's obligation to actually generate revenue from the lands." As explained further below, they also point to the Supreme Court's decision in *Tillamook Co. v. State Board of Forestry*, 302 Or 404, 730 P2d 1214 (1986), as standing for the proposition that the "'greatest permanent value' mandate" in ORS 530.050 "must be a term" in the statutory contract that they contend exists.

Defendants, for their part, do not concede that the Act contained a contractual offer to the counties. Defendants contend that a statutory provision is not contractual unless the legislature "clearly and unmistakably expresses its intent to make it so," and that "nothing in the text of ORS 530.050 suggests that" the obligation to manage lands so as to "secure the greatest permanent value of those lands to the state" is a "contractual term." Additionally, they assert that that latter contention is confirmed by the context of ORS 530.050. Defendants also disagree with plaintiffs' reading of the Supreme Court's decision in *Tillamook Co.*[8]

---

[8] On appeal, the parties' legal arguments are supplemented and buttressed by several *amici curiae* briefs. An *amicus* brief filed by the Council of Forest Trust Land Counties takes the position that the counties that conveyed land to the state under the Act have enforceable contract rights regarding management of those lands. An *amicus* brief filed by the Oregon Forest & Industries Council presents discussion of the requirements of the Endangered Species Act ("ESA") and the Clean Water Act ("CWA"). Finally, an *amici* brief filed by the Northwest Guides and Anglers Association, North Coast Communities for Watershed Protection, Oregon Wild, Native Fish Society, Cascadia Wildlands, Wild Salmon Center, the Center for Biological Diversity, Umpqua Watersheds, and Beyond Toxics includes

As explained below, in conducting our analysis in this case, we assume without deciding that the 1941 Act created a statutory contract to at least some extent. The question before us then is whether the 1941 Legislative Assembly intended the "greatest permanent value" management standard, originally set forth in Oregon Laws 1941, chapter 236, section 5, and now codified at ORS 530.050, to be a term of that statutory contract. We conclude that the text, context, and legislative history regarding the obligation of the Board to secure the "greatest permanent value of such lands to the state" do not reflect the clear and unmistakable intent necessary to conclude that that obligation is a term in the statutory contract. *See Moro v. State of Oregon*, 357 Or 167, 202, 351 P3d 1 (2015) (noting "the standard of clear and unmistakable contractual intent applies to both the question of whether there is an offer to form a contract and also to whether a particular provision is a term of that offer").

In reaching that conclusion, we first consider the Supreme Court's decision in *Tillamook Co.* and explain that, although that opinion reflects that the counties that conveyed land to the state pursuant to the Act have a protected, recognizable interest that can be asserted against the state, it does not does not hold that the "greatest permanent value" management standard in ORS 530.050 is a term in a statutory contract between the state and the Oregon counties that transferred land to the state. We next set forth our methodology for discerning whether a statute contains a contractual promise and explain that we treat a statute as a contractual promise only if the statute's text, context, and legislative history reflect the clear and unmistakable legislative intent to create a contract. We then turn to consideration of the text, context, and legislative history of Oregon Laws 1941, chapter 236, section 5.

A.   *The* Tillamook Co. *Decision*

As noted, before turning to our analysis of defendants' seventh assignment of error and setting forth our methodology for discerning whether a particular statutory

---

arguments concerning the meaning of ORS 530.050, as well as discussion of the requirements of the ESA and CWA.

provision is a term in a statutory contract, we first consider the import of the Supreme Court's decision in *Tillamook Co.*

The dispute in *Tillamook Co.* concerned a law that directed the Board to cooperate with the Oregon State Department of Transportation in exchanging certain land owned by the state located in Linn County for a privately owned tract of land called Crabtree Valley, which was also located in Linn County. 302 Or at 409, 409 n 3. The state had acquired the land in Linn County that it sought to exchange for Crabtree Valley from Linn County pursuant to the Act. *Id.* at 410. The legislature intended to preserve Crabtree Valley, once acquired, as a state park. *Id.* Linn County had been receiving timber revenue from the land that the state sought to exchange for Crabtree Valley, and it would receive no revenue from Crabtree Valley if the land was used as a state park. *Id.*

Twelve Oregon counties that had conveyed land to the state pursuant to the Act brought a declaratory judgment action against the state as well as other governmental entities, seeking a declaration that the "counties' conveyance of tax-foreclosed lands to the state pursuant to [the Act] created a contract or trust relationship between the parties and that the state cannot unilaterally transfer such revenue-producing lands to third parties in exchange for non revenue-producing lands *** without being in breach of this contract or trust." *Id.* at 406, 411. During the course of the litigation, the state admitted that it "actively promoted the benefits of county participation in the program which included assurances that the lands would be used to produce revenue, and that the revenue would be distributed to the counties in a manner then provided by statute, unless counties agreed to any changes in the distribution formula." *Id.* at 416.

The Supreme Court began its analysis by observing that "Linn County deeded forest land to the state under a statutory arrangement providing that a percentage of the revenue derived from the sale of forest products from such lands shall be paid to the county" and that "Linn County stands to lose revenue if the transfer of the Crabtree Valley tract is completed." *Id.* at 413. It explained that the "statutory

land exchange and revenue distribution scheme"—*i.e.*, the Act—"gave Linn County the option of transferring forest lands to the state to manage," and that that statutory scheme "contemplates consensual dealings between the counties and the state (through the Board of Forestry), dealings that would create enforceable rights insofar as the state's management of formerly county owned forest land is concerned." *Id.* at 416. The court concluded:

> "Under ORS chapter 530, Linn County has a protected, recognizable interest that can be asserted against the defendants. Linn County transferred forest land, land that it could have kept and administered for its own benefit, to the state, 'in consideration of the payment to [Linn County] of the percentage of revenue derived from such lands.' ORS 530.030(1). It is entitled to enforce that claim for its percentage of revenue, and the state cannot avoid its obligation to Linn County by conveying the property to a third person."

*Id.* at 416-17 (brackets in original).

The court, however, deemed it "unnecessary to describe the arrangement" under the Act between the state and the counties in "contract or trust terms." *Id.* at 416. Instead, it looked "to the statutes to determine what flows from them." *Id.*

On appeal, as noted, plaintiffs argue that the court's decision in *Tillamook Co.* supports their position that the "greatest permanent value" standard in ORS 530.050 is part of a statutory contract between the state and the counties. Specifically, pointing to the court's statement that the counties have "enforceable rights insofar as the state's management of formerly county owned forest land is concerned," plaintiffs argue that "[b]ecause the court in *Tillamook* * * * recognized that the Counties' enforceable rights included the right to have the lands managed, the term governing that management—the 'greatest permanent value' mandate—must be a term of the contract." Plaintiffs contend that if "the Counties had no enforceable rights under ORS 530.050," in the *Tillamook Co.* litigation the state "would have been free to complete the exchange and manage the new lands as a non-revenue generating state park for recreation purposes."

We disagree with plaintiffs' reading of *Tillamook Co.* And we do not think that the court's reference to counties having enforceable rights "insofar as the state's management of formerly county owned forest land is concerned" indicates that the court held that the "greatest permanent value" management standard in ORS 530.050 is a term of a statutory contract between the state and the counties. Rather, we understand the court's reference to enforceable rights "insofar as the state's management of formerly county owned forest land is concerned" to refer to the particular management issue relevant to the *Tillamook Co.* decision—*i.e.*, whether, consistent with the obligation owed by the state to the counties under ORS 530.030(1), the state can unilaterally exchange revenue-producing land for non-revenue-producing land, thereby altogether avoiding its obligation to share revenue with the counties, which is the only "consideration" specified in ORS 530.030(1). The court in *Tillamook Co.* held that the state could not do so and, in so holding, said nothing about the "greatest permanent value" management standard in ORS 530.050. In our view, holding that the state cannot avoid the obligation to counties created under ORS 530.030(1) by unilaterally exchanging revenue-producing land for non-revenue-producing land says nothing about whether the statutory provision regarding how the state is to manage forestlands, ORS 530.050, is part of an enforceable contractual obligation.

Ultimately, in our view, *Tillamook Co.* tells us that counties that transferred land to the state pursuant to the Act have some "protected, recognizable interest" that can be asserted against the state—be it one that arises from contract, trust, or otherwise—as a result of transferring land to the state "in consideration of the payment to such county of the percentage of revenue derived from such lands," as set forth in ORS 530.030(1); that that interest entitles counties to bring claims asserting their right to the percentage of revenue as set forth in ORS 530.030(1); and that the state cannot avoid its obligation to the counties under the Act by unilaterally conveying revenue-producing land to a third party in exchange for non-revenue-producing land.

It does not hold—nor does it indicate—that the "greatest permanent value" management standard in ORS

530.050, originally set forth in Oregon Laws 1941, chapter 236, section 5, is a term in a statutory contract between the state and Oregon counties that transferred land to the state. We turn to that issue.

B.  *Analysis of Statutory Contracts*

With that statutory and case law background in mind, we set forth Oregon's methodology for ascertaining the existence and terms of statutory contracts.

Oregon law has long recognized that "legislative enactments may contain provisions which, when accepted as the basis of action by individuals, become contracts between them and the state." *Campbell et al. v. Aldrich et al.*, 159 Or 208, 213, 79 P2d 257 (1938). However, when "the legislature pursues a particular policy by passing legislation, it does not usually intend to prevent future legislatures from changing course." *Moro*, 357 Or at 195. Accordingly, we have "long applied a canon of construction that disfavors interpreting statutes as contractual promises." *Id.*; *see also Strunk v. PERB*, 338 Or 145, 171, 108 P3d 1058 (2005) ("The intention to surrender or suspend legislative control over matters vitally affecting the public welfare cannot be established by mere implication." (Internal quotation marks omitted.)).

We treat a statute as a contractual promise "only if the legislature has clearly and unmistakably expressed its intent to create a contract." *Health Net, Inc. v. Dept. of Rev.*, 362 Or 700, 716, 415 P3d 1034 (2018) (internal quotation marks omitted). And we have said that, where "doubt concerning the formation of such an agreement exists, that rule eliminates the state's alleged contractual obligations." *FOPPO v. State of Oregon*, 144 Or App 535, 539, 928 P2d 335 (1996).

The "standard of clear and unmistakable contractual intent applies to both the question of whether there is an offer to form a contract and also to whether a particular provision is a term of that offer." *Moro*, 357 Or at 202. When it has been determined that a particular statutory scheme contains a contractual promise, the "standard of clear and unmistakable intent *** focuses only on whether the legislature intended a particular *** provision to be part of that promise." *Id.* at 203.

In examining legislative intent, we can "infer the intent to create a contract from the text, context, and legislative history, as long as those sources, considered together, demonstrate a clear and unmistakable intent to impose contractual obligations on the state." *Health Net, Inc.*, 362 Or at 716. But "we have not required a statute to use language referring directly to contracts, promises, or guarantees." *Id.*

C.   *Text, Context, and Legislative History*

We now turn to an analysis of the text, context, and legislative history of Oregon Laws 1941, chapter 236, section 5, and the provision presently codified at ORS 530.050, which requires the Board to manage lands conveyed under the Act "so as to secure the greatest permanent value of those lands to the state." In so doing, our aim is to determine whether the legislature intended that provision to be a term in a statutory contract that, as asserted by plaintiffs, requires the state to maximize revenue from the lands.

But, before conducting our analysis, we must "ensure that we are ascertaining the intent of the correct legislature—an inquiry that is critical when analyzing statutory contracts." *Strunk*, 338 Or at 189. "That is so because the fundamental purpose behind such contracts is to bind future legislative action." *Id.* Our understanding of plaintiffs' claim is that it was the 1941 Legislative Assembly that promised that, if counties conveyed lands to the state, in exchange, the state would manage such lands "so as to secure the greatest permanent value of such lands to the state," which, in plaintiffs' view, requires maximization of revenue. Consequently, the 1941 enactment provides the version of the Act to which we will look in ascertaining the legislature's promissory intent (or lack thereof) with respect to that provision.

Additionally, we are mindful that, as discussed above, *Tillamook Co.* held that counties that transferred land to the state pursuant to the Act have a protected, recognizable interest—be it one that arises from contract, trust, or otherwise—which entitles them to a percentage of revenue as set forth in the Act. In conducting our analysis in this case, we assume without deciding that the 1941 Act created a statutory contract to at least some extent. The

question before us then is whether the 1941 Legislative Assembly intended the "greatest permanent value" management standard set forth in Oregon Laws 1941, chapter 236, section 5, to be a term of that statutory contract.[9]

    1.   *The text*

      We begin with the text: "'[T]he text of the statutory provision itself is the starting point for interpretation and is the best evidence of the legislature's intent.'"

*State v. Swenson*, 317 Or App 546, 549, 506 P3d 489 (2022) (quoting *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993)).

      Oregon Laws 1941, chapter 236, section 5 provided, in pertinent part:

> "1.   The board shall manage the lands acquired pursuant to this act *so as to secure the greatest permanent value of such lands to the state*, and to that end is empowered and authorized:

---

   [9] We note that, on appeal and in the trial court, plaintiffs have pointed to a circuit court decision, *Tillamook County v. State of Oregon*, Tillamook County Circuit Court No. 04-2118 (July 5, 2005) (*Tillamook II*). At issue in *Tillamook II* was a dispute concerning the legislature's enactment of 2003 House Bill (HB) 2148, and specifically section 4(5) of that bill, which transferred $10 million from the State Forestry Department Account to the General Fund. According to the circuit court, the plaintiffs' complaint in *Tillamook II* alleged, "in essence, that the transfer by the State was a unilateral one that could not be made without the consent of the Counties in light of the history of the legislation now embodied in ORS 530.010 to 530.280." The circuit court invalidated HB 2148, section 4(5), holding that "it is clear and unambiguous that the revenues going to the State under ORS 530.110(1)(c) cannot be transferred to the General Fund by the state without the consent of the counties."

   On appeal, plaintiffs assert that, in *Tillamook II*, the circuit court held that "the parties' contract [under the Act] barred the legislature from diverting the State's share of revenue [derived from forestlands acquired under the Act] from the statutorily dedicated uses of that revenue." Plaintiffs contend that, given the court's holding in *Tillamook II*, "issue preclusion bars the State from relitigating the established law that the Counties can enforce their rights under the parties' contract against the State."

   For the purposes of our analysis, we assume—but do not decide—that *Tillamook II* precludes the state from relitigating the issue of the existence of a statutory contract. We do not, however, understand *Tillamook II* to have any preclusive effect with regard to the issue in this case as framed above: assuming that the 1941 Act did create certain obligations on the part of the state that are contractual in nature, whether the 1941 Legislative Assembly intended the "greatest permanent value" management standard set forth in Oregon Laws 1941, chapter 236, section 5, to be a term of that statutory contract.

"(a)   To protect said lands from fire, disease and insect pests, to cooperate with the several counties of the state and with persons, firms and corporations owning lands within the state in such protection and to enter into all agreements necessary or convenient therefor.

"(b)   To sell forest products from said lands; to make and execute contracts, for periods in no case exceeding 10 years, for the mining and removal of minerals and fossils in said lands.

"(c)   To permit the use of said lands for grazing, recreation and other purposes when, in the opinion of the board, such use is not detrimental to the purposes of this act.

"(d)   To grant easements and rights of way over, through and across the said lands.

"(e)   To reforest said lands and to cooperate with the several counties of the state, and with persons, firms and corporations owning timber lands within the state in such reforestation, and to make all agreements necessary or convenient therefor.

"(f)   To require such undertakings as in the opinion of the board are necessary or convenient to secure performance of any contract entered into under the terms of this act.

"(g)   To do all things and to make all rules and regulations, not inconsistent with law, necessary or convenient for the management, protection, utilization and conservation of said lands."

(Emphasis added.)

Initially, we observe that Oregon Laws 1941, chapter 236, section 5, directs the Board to secure the "greatest permanent value of such lands *to the state*." (Emphasis added.) In our view, the reference to "the state"—as opposed to the counties—as the entity that the Board is directed to look to in securing the "greatest permanent value" is noteworthy. It suggests that the legislature intended that, in discerning what constitutes "value," the Board considered "value" to the state, as a whole, not solely "value" to the counties. That intent may have followed from the fact that, as noted above, the management standard in Oregon Laws 1941, chapter 236, section 5, governed the Board's

obligations in the management of *all* land acquired under the Act, not only land conveyed by Oregon counties. That the legislature directed the Board to look to the state as the reference point for "value" suggests to us that it was the state, as a whole, and not the counties, that was intended to be the beneficiary of the management standard set forth in Oregon Laws 1941, chapter 236, section 5. In our view, that militates against concluding that the "greatest permanent value" management standard was intended to be part of the contractual offer to the counties.

Relatedly, although a term of a statutory contract can be established without language referring directly to "contracts, promises, or guarantees," *Moro*, 357 Or at 203, the directive in Oregon Laws 1941, chapter 236, section 5, that the Board "shall manage the lands acquired pursuant to this act so as to secure the greatest permanent value of such lands to the state" does not contain a promise to the counties. That language is not "unambiguously promissory" with regard to the counties. *Cf. Strunk*, 338 Or at 184, 186 (statute was "unambiguously promissory" where it provided that, "[u]pon retiring from service at normal retirement age or thereafter, a *member of the system shall receive* a service retirement allowance which *shall consist of the following* annuity and pensions" (emphases added)).

The absence of promissory language in section 5 is notable, because, as discussed further below, another section of the 1941 enactment—section 3—contains language that seemingly *does* sound in contract, *is* unambiguously promissory, and, per the holding in *Tillamook Co.*, does create rights that counties are entitled to enforce against the state. *See* Or Laws 1941, ch 236, § 3 ("The county court *** is authorized *** to convey to the state for state forests any lands heretofore or hereafter acquired *** *in consideration of the payment* to such county of the percentage of revenue derived from such lands as provided in section 9 of this act." (Emphasis added.)). Indeed, if the legislature had intended the "greatest permanent value" management standard in Or Laws 1941, chapter 236, section 5, to be part of the offer to the counties embodied in Or Laws 1941, chapter 236, section 3, the legislature likely would have used such unambiguous promissory language. *Cf. James v. State of Oregon*,

366 Or 732, 759, 471 P3d 93 (2020) ("If the legislature had intended a different result in this case, it would have written the jurisdictional provision differently.").

We also observe that nothing in the text of Oregon Laws 1941, chapter 236, section 5, indicates an intent to prevent future legislatures from amending the management standard, at least so long as the generation of revenue remains one of the uses of state forests. As we have previously stated, "where the legislation 'contains nothing indicative of a legislative commitment not to repeal or amend the statute in the future,' a statutory contract probably cannot be found." *Smejkal v. DAS*, 239 Or App 553, 560, 246 P3d 1140 (2010), *rev den*, 351 Or 541 (2012) (quoting *FOPPO*, 144 Or App at 539-40; brackets omitted); *see also Eckles v. State of Oregon*, 306 Or 380, 391, 760 P2d 846 (1988) ("[I]f the Legislative Assembly had simply provided in ORS 656.634 that the [Industrial Accident Fund] was to be used for the purposes stated in ORS 656.001 to 656.794, a contractual obligation probably could not have been inferred from the provision because it would have contained nothing indicative of a legislative commitment not to repeal or amend the statute in the future.").

To be sure, Oregon Laws 1941, chapter 236, section 5, directs what the Board "shall" do, and use of the word "shall" is a "factor that can weigh in favor of finding a statutory contract offer," *Moro*, 357 Or at 225-26, but that word alone does not "suffice to create contractual obligations on behalf of the state," *FOPPO*, 144 Or App at 541 (so noting with respect to the phrase "shall be"). Not "every statutory usage of the words 'shall' or 'will' means that an enacting legislature meant to forever bind future legislatures." *Moro*, 357 Or at 238 n 2 (Brewer, J., concurring). And, in view of the specific acts the Board "may" take, as specified in paragraphs (a) through (g) of section 5 of the 1941 enactment, we understand the "shall" directive in section 5 as directing administrative acts by the Board, not reflecting a contractual promise to the counties. *See id.* (Brewer, J., concurring) ("Sometimes, the use of [shall or will] can be meant merely to direct an administrative act by an executive agency."). That is because paragraphs (a) through (g) specify a range of administrative acts the Board is empowered and authorized

to take to fulfill its obligation to manage lands acquired under the Act "so as to secure the greatest permanent value of such lands to the state," including doing "all things and [making] all rules and regulations, not inconsistent with law, necessary or convenient for the management, protection, utilization and conservation of said lands."

Put another way, notwithstanding the use of "shall," nothing in the text of Oregon Laws 1941, chapter 236, section 5, suggests that the legislature intended the "greatest permanent value" management standard to be an immutable promise. *See Strunk*, 338 Or at 178, 192 ("Nothing in the text of ORS 238.200(1)(a) (2001)"—which provided that "[a]n active member of the [PERS] system *shall* contribute to the fund and there *shall* be withheld from salary of the member six percent of that salary"—supported "petitioners' argument that the legislature intended that contribution to be immutable." (Emphases added.)).

We also note that, perhaps, bound up with the question of whether the provision requiring that the Board "shall manage the lands acquired pursuant to this act so as to secure the greatest permanent value of such lands to the state" is a term in a contractual offer as the counties assert, there is a question regarding whether that phrase is ambiguous. For the purposes of our analysis in this opinion, we do not need to conclusively construe the phrase "greatest permanent value," but we do observe that that language as used in Oregon Laws 1941, chapter 236, section 5, is, in our view, ambiguous.[10] That is because, among other reasons,

---

[10] The trial court determined that the meaning of the statutory phrase "greatest permanent value" was a question of fact for the jury to decide. And, on appeal, plaintiffs contend that if the "'greatest permanent value' mandate" is a term in a statutory contract between plaintiffs and the state, and that term is ambiguous, the meaning of that term is a question of fact for a jury to decide.

We disagree with the trial court and plaintiffs. As the Supreme Court has stated, "determining the meaning of a statute is a question of law, ultimately for the court." *Bergerson v. Salem-Keizer School District*, 341 Or 401, 411, 144 P3d 918 (2006) (internal quotation marks omitted). And as we explained in *Karjalainen v. Curtis Johnston & Pennywise, Inc.*, 208 Or App 674, 681, 146 P3d 336 (2006), *rev den*, 342 Or 473 (2007), in "no event is the *meaning* of a statutory term determined as a question of fact." (Emphasis in original.). *See also* ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible."). In fact, "the *ad hoc*, case-by-case interpretation of statutes—possibly resulting in the same statutory term being construed to mean

historically, "value" has myriad definitions, some of which could relate to revenue production and others that do not relate to revenue production. *Webster's New Int'l Dictionary* 2814 (unabridged 2d ed 1934) (defining value, among other ways, as "[a] fair return in money, food services, etc., for something exchanged"; "[t]he quality or fact of being worth while, excellent, useful, or desirable"; "relative worth, importance, or utility"). We think that the ambiguous nature—or, as the trial court framed it, the "to some extent vague" nature—of the phrase "greatest permanent value" as used in Oregon Laws 1941, chapter 236, section 5, militates against the conclusion that the 1941 Legislative Assembly intended whatever offer may have been extended by the state in the 1941 Act as including a contractual promise to the counties to "secure the greatest permanent value of such lands to the state." *See Moro*, 357 Or at 237 n 1 (Brewer, J., concurring) (noting the "lack of ambiguity" requirement "applies not only to the existence of a contract, but also to the 'extent of the obligation created' by the contract, that is, whether its terms encompass a particular promise." (Quoting *Eckles*, 306 Or at 397.)).[11]

Additionally, it appears to us that the management standard set forth in Oregon Laws 1941, chapter 236, section 5,

---

different things in different cases—would run afoul of constitutional obligations of equal treatment." *Karjalainen*, 208 Or App at 681 (emphasis in original).

In any event, as we explain later in this opinion, we understand the ambiguous nature of the meaning of the management standard and another aspect of the text of Oregon Laws 1941, chapter 236, section 5 to indicate that section 5 reflects an intent to delegate authority to the Board, rather than extend a contractual offer to the counties.

[11] The ambiguity is borne out by other aspects of the 1941 Act. For example, under the 1941 Act, the state was authorized to acquire lands that were "chiefly valuable" for the production of revenue (*i.e.*, the production of forest crops) and land that was not necessarily "chiefly valuable" for the production of revenue (*i.e.*, watershed production and development, and recreation). *See* Or Laws 1941, ch 236, § 1 ("The state board of forestry, *** hereby is authorized and empowered *** to acquire *** lands which *** are chiefly valuable for the production of forest crops, watershed protection and development, erosion control, grazing, recreation or forest administrative purposes.").

We also observe that the legislature included less ambiguous language regarding forest management for the purpose of revenue production in prior enactments. *See* Or Laws 1913, ch 124, § 3 ("[P]rovided, that in any disposal of products or privileges the first consideration shall be the care, maintenance and perpetuation of the tract's forest productivity as a source of maximum permanent revenue ***.").

was intended to be a statutory delegation of authority to the Board, rather than a term in a contractual offer to the counties. That is not only because of its ambiguous nature, but also because in Oregon Laws 1941, chapter 236, section 5, the legislature expressly entrusted to the "opinion of the board" decisions regarding when use of forestland for "grazing, recreation, and other purposes" would not be "detrimental to the purposes" of the Act. Or Laws 1941, ch 236, § 5 (empowering and authorizing the Board to "permit the use of said lands for grazing, recreation and other purposes when, in the opinion of the board, such use is not detrimental to the purposes of this act").

Plaintiffs view the text of Oregon Laws 1941, chapter 236, section 5, differently than we do. In arguing their appeal, plaintiffs contend that, because "revenue secured to the State through the State Forester's management" must be "shared in fixed proportion among parties," securing the "greatest permanent value" to the state—as the Act requires that the Board do—also secures the greatest permanent value to the counties in terms of revenue. As plaintiffs see it, the state and the counties have a "mutual interest" in receiving revenue from the lands, and "[m]aximizing the revenue obtained by the State necessarily maximizes the revenue obtained by the Counties under the terms of the parties' contract." We understand plaintiffs' position to be that we should not put undue weight on the fact that the "greatest permanent value" standard uses "the state," not the counties, as a point of reference with regard to "value."

The difficulty with plaintiffs' position is twofold. First, it is premised on the notion that the "value" the state must obtain under the "greatest permanent value" management standard is maximization of revenue at the expense of other kinds of value (either economic or noneconomic). But, as noted, the "greatest permanent value" management standard is, at the very least, ambiguous as to whether it requires maximization of revenue.

More importantly, even assuming plaintiffs are correct that the state and the counties' interests are necessarily (and perfectly) aligned, such that securing the "greatest permanent value" to the state is also securing the

"greatest permanent value" to the counties that transferred land to the state under the Act, the text falls short of the clear and unambiguous standard plaintiffs are required to meet to turn a statutory obligation into a contractual promise because the legislature chose "value to the state" as the point of reference, rather than "value to the counties." *See Strunk*, 338 Or at 192 (concluding a statute was not a part of the statutory PERS contract where the text and "statutory context do not establish clearly and unambiguously that the legislature intended" the statute to be a promise to PERS members); *Health Net, Inc.*, 362 Or at 719 ("Given those competing considerations, we cannot say that the text of Articles III and IV clearly and unmistakably creates contractual obligations, which is the standard that taxpayer must meet to convert a statute into a contract."). That is, the text of Oregon Laws 1941, chapter 236, section 5, does not clearly and unambiguously indicate that the 1941 Legislative Assembly intended the "greatest permanent value" management standard to be a term in the statutory contract.

2. *The context*

Having considered the text of Oregon Laws 1941, chapter 236, section 5, we turn to context. Context is essential to our analysis of statutory contracts; we cannot view a provision "in isolation and evaluate whether [the provision], standing alone, demonstrates the requisite unambiguous legislative intent to create a contractual obligation." *Hughes v. State of Oregon*, 314 Or 1, 23, 838 P2d 1018 (1992).

In this case, essential context includes Oregon Laws 1941, chapter 236, section 3, which as noted above, does create enforceable rights and includes specific reference to the "consideration" that counties were to receive in exchange for conveying land to the state: "The county court *** is authorized *** to convey to the state for state forests any lands heretofore or hereafter acquired *** *in consideration* of the payment to such county of the percentage of revenue derived from such lands as provided in section 9 of this act." (Emphasis added.) As the court explained in *Moro*, 357 Or at 196 n 18, "'[c]onsideration' is that which one party provides to the other in exchange for entering into the contract."

In our view, Oregon Laws 1941, chapter 236, section 3, may have contained an offer by the 1941 Legislative Assembly to form a unilateral contract, which the counties accepted when they conveyed land to the state under the Act. *Moro*, 357 Or at 198 ("An offer for a unilateral contract invites the other party to accept with performance—that is, by actually *doing* the performance that the offering party seeks." (Emphasis added.)). Assuming but not deciding that Oregon Laws 1941, chapter 236, section 3 did contain a contractual offer by the state to the counties, we think it noteworthy that absent from the "consideration" that the state offered to provide to the counties in section 3 in exchange for the conveyance of land to the state is any reference to section 5 of the 1941 Act or to the "greatest permanent value" standard. To the contrary, the *only* consideration specified in Oregon Laws 1941, chapter 236, section 3, is the "payment to such county of the percentage of revenue derived from such lands as provided in section 9," and, section 9, in turn, sets forth the scheme for distribution of revenue generated by lands acquired under the Act. Or Laws 1941, ch 236, §§ 3, 9. Reading into Oregon Laws 1941, chapter 236, section 3, consideration *in addition* to the consideration specified by the 1941 Legislative Assembly in section 3 related to revenue sharing—*i.e.* reading in a contractual obligation to maximize revenue by "securing the greatest permanent value"—would be counter to the legislature's direction that in "the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted." ORS 174.010.

In seeking a different result, plaintiffs argue that, as a matter of context, the "greatest permanent value" standard now codified at ORS 530.050 must be a term of the statutory contract between the state and the counties. As plaintiffs see it, the "greatest permanent value" standard is "remunerative and essential to the purpose of the contract because it is the sole source of the State's obligation to actually generate revenue from the lands."

We are not persuaded by plaintiffs' argument. In *Strunk*, the Supreme Court considered whether 2003 legislation

that amended ORS 238.200(1)(a) and diverted contributions from PERS members' "regular accounts" to "IAP accounts" breached the statutory promise embodied in ORS 238.300 that, "at retirement, the member would be entitled to receive a service retirement allowance calculated under the formula that yielded the highest pension amount." 338 Or at 179, 192. As a result of the 2003 legislation, most mid-career employees who were PERS members would effectively lose the option of retiring under the "Money Match" formula for calculating retirement benefits and would instead have to retire under the less generous "full formula." *Id.* at 183-84.

Prior to the 2003 legislation, ORS 238.200(1)(a) (2001) had provided, "An active member of the system shall contribute to the fund and there shall be withheld from salary of the member six percent of that salary," and ORS 238.200(2) (2001) had provided that "[t]he contributions of each member as provided in subsection (1) of this section shall be deducted by the employer from each payroll and transmitted by the employer to [PERB], which shall cause them to be credited to the member account of the member." *Id.* at 178-79. The 2003 legislation amended ORS 238.200 to discontinue such contributions, which had been required under ORS 238.200 (2001). *Id.* at 179.

After considering the text, context, and legislative history, the court concluded that the legislature did not alter or eliminate the promise in ORS 238.300 (2001) that "each eligible member ***, at retirement, *** would be entitled to receive a service retirement allowance calculated under the formula that yielded the highest pension amount" when it enacted the 2003 legislation, even though the 2003 legislation prohibited PERS members from contributing to their regular accounts, deprived many PERS members of the option of retiring under the "Money Match" formula and, as a result, caused many PERS member to receive less money in retirement than they would otherwise have received absent the 2003 amendments. *Id.* at 183-84, 191. Put simply, the 2003 amendments did not eliminate employees' entitlement to a retirement benefit calculated under the formula that yielded the highest pension amount, despite those amendments effectively eliminating one of the previously available

formulas for calculating that retirement benefits for many PERS members.

Moreover, in considering the requirements of ORS 238.200(1)(a) (2001), the court determined that "[n]othing in the text of ORS 238.200(1)(a) (2001), which required PERS members to contribute six percent of their salaries to the fund, supports petitioners' argument that the legislature intended that contribution to be immutable," and noted that "the text of ORS 238.200(1)(a) (2001) and its statutory context do not establish clearly and unambiguously that the legislature intended to promise members that they could contribute six percent of their salaries to their regular accounts throughout their PERS membership so as to maximize their pension component calculation under the Money Match." *Id.* at 192-93.

We believe *Strunk* to be instructive here. In this case, assuming the Act contained a statutory promise to the counties, it would be found in Oregon Laws 1941, chapter 236, section 3, *codified as amended* at ORS 530.030; similarly, the statutory promise in *Strunk* was found in ORS 238.300 (2001). That the Board's management of land under the "greatest permanent value" management standard, as originally set forth in Oregon Laws 1941, chapter 236, section 5, affects the amount of revenue that the counties receive pursuant to Oregon Laws 1941, chapter 236, section 3, *codified as amended* at ORS 530.030, does not necessitate that the "greatest permanent value" management standard in section 5 is a part of the statutory contract created by section 3; just as in *Strunk*, the ability of PERS members to contribute to their regular member account under ORS 238.200(1)(a) (2001) was not a part of the statutory contract set forth in ORS 238.300 (2001), notwithstanding that, for many PERS members, amending ORS 238.200 (2001) affected their retirement income and would, effectively, force them to retire under a different and less generous formula for calculating their retirement benefits.

Further, we do not foreclose that the state may have some obligation to generate revenue from the forestlands it acquired from the counties that is attendant to, or implicit

in, the obligation that the state undertook when it offered, in consideration for the land conveyed by the counties, to distribute to the counties a "percentage of revenue derived from [land conveyed by the counties under the Act] as provided in section 9." Or Laws 1941, ch 236, § 3. Certainly, under *Tillamook Co.*, the state cannot altogether avoid that obligation by conveying revenue producing land to a third-party in exchange for non-revenue producing land. 302 Or at 416-17.

For the purposes of our analysis, however, we need not reach that legal issue: Plaintiffs' contention is that the "greatest permanent value" management standard set forth in Oregon Laws 1941, chapter 236, section 5, was part of the state's offer to the counties. For the reasons explained above, and particularly that Oregon Laws 1941, chapter 236, section 3, specified the consideration that was offered to counties in exchange for the conveyance of land and that consideration did not expressly include the "greatest permanent value" management standard, the context of the "greatest permanent value of such lands to the state" as used in Oregon Laws 1941, chapter 236, section 5, does not reflect the "clear and unmistakable intent" for that provision to be term in a statutory contract.

3.   *The absence of useful legislative history*

On appeal, in advancing their arguments concerning whether the obligation of the Board to manage lands conveyed to the state by the counties "so as to secure the greatest permanent value of such lands to the state" is a term in a statutory contract, neither party cites legislative history relevant to whether that phrase, as originally set forth in Oregon Laws 1941, chapter 236, section 5, was intended by the 1941 Legislative Assembly to constitute a contractual promise. Nor—perhaps due to the age of the enactment—have we been able to find any legislative history that bears on the question of whether the 1941 Legislative Assembly intended the "greatest permanent value" management standard in Oregon Laws 1941, chapter 236, section 5, to be a contractual promise to Oregon counties.

4.  *The text and context regarding the phrase "greatest permanent value of such lands to the state," as set forth in Oregon Laws 1941, chapter 236, section 5, does not clearly and unmistakably create a contractual obligation.*

In view of the foregoing text, context, and absence of useful legislative history, we conclude that the standard of "clear and unmistakable intent" is not met with regard to whether the 1941 Legislative Assembly intended the Board's obligation to manage forestlands conveyed by the counties so as to "secure the greatest permanent value of such lands to the state" is a term in the statutory contract between the state and the counties.[12]

## III.   CONCLUSION

The state and Oregon counties have long cooperated in the management of Oregon's forests. And, particularly in view of *Tillamook Co.*, there can be no doubt that the statutory scheme attendant to that cooperation, ORS 530.010 to 530.181, creates certain enforceable rights insofar as the state's management of formerly county-owned forestland is concerned. However, the text, context, and absence of useful legislative history regarding the obligation of the Board to secure the "greatest permanent value of such lands to the state," as originally set forth in Oregon Laws 1941, chapter 236, section 5, and now codified as amended at ORS 530.050,

---

[12] We note that, in arguing that the phrase "greatest permanent value of such lands to the state" is a term in a statutory contract requiring the state to maximize revenue, plaintiffs also point to what they term "the historical context of the 1941 Act." In their view, that "historical context" shows that the "'greatest permanent value' term and the revenue obligation it created were essential to inducing the Counties to convey their lands to the State under the 1941 Act." Plaintiffs further posit that, "[w]here the Counties chose to accept the State's offer under the terms negotiated in 1941, it was because they understood the State would manage those lands to produce revenue under the 'greatest permanent value' management mandate."

We appreciate the significance of the historical context to which plaintiffs' point. In our view, however, given our methodology for discerning legislative intent, that historical context does not alter our conclusion that the standard of "clear and unmistakable intent" is not met with regard to whether the 1941 Legislative Assembly intended the Board's obligation to manage forestlands conveyed by the counties so as to "secure the greatest permanent value of such lands to the state" to be a term in a statutory contract between the state and the counties.

do not reflect the clear and unmistakable intent necessary to conclude that that obligation is a term in a statutory contract. Consequently, we conclude that the trial court erred in denying defendants' motion to dismiss. We reverse and remand.[13]

Reversed and remanded on appeal; cross-appeal dismissed as moot.

---

[13] In this opinion, in conducting our analysis, we have looked to the 1941 version of the Act. As noted above, the Act has been amended since 1941. Those amendments have not changed the language in the Act requiring that the Board "shall manage" land acquired under the Act "so as to secure the greatest permanent value" of such lands "to the state," but they have altered the options that the Board is authorized to take in pursuit of that end.

We note specifically that, although the 1941 Act permitted the Board to use the lands acquired under the Act "for grazing, recreation and other purposes when, in the opinion of the board, such use *is not detrimental to the purposes of this act*," Or Laws 1941, ch 236, § 5 (emphasis added), in 1967, the legislature amended the Act to allow the Board to:

"[p]ermit the use of the lands for other purposes, including but not limited to forage and browse for domestic livestock, fish and wildlife environment, landscape effect, protection against floods and erosion, recreation, and protection of water supplies when, in the opinion of the board, such use is *not detrimental to the best interest of the state.*"

Or Laws 1967, ch 396, § 3 (emphasis added).

On appeal, plaintiffs assert that the counties consented to the amendments to the Act and that those amendments should be understood to have been "consensual modifications to the parties' contract."

In this opinion, as set forth above, we hold that the management standard in Oregon Laws 1941, chapter 236, section 5, was not part of a contractual offer to the counties. In our view, it follows from that holding that subsequent amendments to section 5 of the 1941 Act, which altered the options that the Board is authorized to take in pursuit of that end, did not turn that management standard into a contractual promise.